Mildred Lea LINTON, by her Next Friend Kathy ARNOLD, on her own Behalf and on Behalf of all Other Persons Similarly Situated, Plaintiffs,

v.

Belle CARNEY, by her Next Friend Mary KIMBLE, on her own Behalf and on Behalf of all Other Persons Similarly Situated, Plaintiffs–Intervenors,

v.

COMMISSIONER OF HEALTH AND ENVIRONMENT, STATE OF TENNESSEE.

No. 3:87–0941.

United States District Court, M.D. Tennessee, Nashville Division.

April 23, 1990.

Pamela F. Wright and George Gordon Bonnyman, Legal Services of Middle Tennessee, Nashville, Tenn., for plaintiffs.

Jennifer Helton Small, Office of Atty. Gen., Nashville, Tenn., for defendant.

Richard F. LaRoche, National Healthcorp, Murfreesboro, Tenn., for amicus Nat. Healthcorp.

Bryon Roscoe Trauger, Doramus & Trauger, Nashville, Tenn., for amicus The Wexford House.

## MEMORANDUM

JOHN T. NIXON, District Judge.

Plaintiffs are before the Court seeking to enjoin a Tennessee policy through which only a portion of the beds in Medicaid participating nursing homes are certified to be available for Medicaid patients. Plaintiffs allege that this policy artificially limits the accessibility of nursing home care to indigent Medicaid patients and fosters discrimination against indigent patients by nursing homes. Plaintiffs claim that, as a result of the challenged policy, they and other individuals similarly situated face delay or outright denial of needed nursing home care, as well as displacement from current residency in nursing home facilities. Plaintiffs bring this action under 29 U.S.C. § 794, the Rehabilitation Act of 1973; 42 U.S.C. § 1396 (Supp.1987), *et seq.*, Title XIX of the Social Security Act, and 42 U.S.C. § 2000d (1982 and Supp.1987) *et seq.*, Title VI of the Civil Rights Act of 1964, and the Due Process Clause of the Fourteenth Amendment.

Final argument in this action was held on January 27, 1989. The parties subsequently requested an opportunity to settle the due process claim, and that claim is therefore not addressed in this Memorandum. By agreement of the parties, all proof previously submitted to the Magistrate in this

case was introduced into evidence, including proof introduced in *Jane Doe v. Mid South Nursing Home, Inc., et al.*, No. 3–87–0760.

The Court, having considered the record in this case, including the pleadings, the stipulations of the parties, the exhibits and the statements of counsel, hereby makes, pursuant to Rule 52 of the Federal Rules of Civil Procedure, the following Findings of Fact and Conclusions of Law as a final adjudication of this matter.

## FINDINGS OF FACT

The present case was initiated on December 1, 1987 on behalf of Mildred Lea Linton.[1] Ms. Linton suffers from rheumatoid arthritis and has been a patient for four years at Green Valley Health Care Center in Dickson, Tennessee [hereinafter "Green Valley"]. A Medicaid patient who had been receiving skilled nursing facility (SNF) level care throughout her stay, the plaintiff received notice from State Medicaid officials that she no longer qualified for such care. The same notice advised her that she would have to move to another nursing home, an intermediate care facility (ICF), to receive the level of care to which the State believed she should be downgraded. Green Valley provides ICF care, and in fact the bed occupied by Ms. Linton was dually certified for Medicaid purposes for provision of both SNF and ICF levels of care. However, Green Valley was unwilling to care for Ms. Linton at an ICF level of reimbursement. The nursing home, which had directed the State to certify only part of its ICF beds as available to Medicaid patients, reserved the right to decertify the plaintiff's bed for Medicaid ICF participation. This decertification would have compelled the plaintiff's involuntary transfer to another facility.

On December 11, 1989, plaintiff Belle Carney, an 89 year old black woman, requested intervention. She had been diagnosed in July 1987 as requiring nursing home treatment due to Alzheimer's disease,

however, no nursing home placement was found for her. Plaintiff Carney asserts that the State's limited bed certification policy, which the State refers to as distinct part certification, creates an artificial restriction on the number of available Medicaid beds and that it fosters discrimination against Medicaid patients by nursing homes. Plaintiff Carney's health deteriorated over a period of several months as she was moved from one inadequate placement to another. Finally, Carney's condition declined to the point that she required emergency hospitalization. Carney filed a motion to intervene at this time, and the Court affirmed the Magistrate's determination that plaintiff Carney possessed the requisite standing.

Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* authorizes the expenditure of federal funds to enable states to furnish medical assistance to indigent individuals who are aged, blind or disabled, or who are members of families with dependent children. Tennessee participates in Title XIX for the purpose of operating such a medical assistance program ("Medicaid"), pursuant to T.C.A. § 71–5–101 *et seq.* [previously § 14–23–101 *et seq.*] Approximately, seventy per cent of the cost of the Tennessee Medicaid program is paid by the Health Care Financing Administration (HCFA) of the United States Department of Health and Human Services. In return for receipt of federal subsidies, the State of Tennessee is required to administer its Medicaid program in conformity with a state plan which satisfies the requirements of Title XIX and regulations promulgated pursuant thereto, and which has been submitted to, and approved by the Secretary of Health and Human Services. 42 U.S.C. §§ 1396, 1396a.

Under the terms of Tennessee's approved State Medicaid plan, and pursuant to T.C.A. § 71–5–104, the Tennessee Department of Health and Environment (TDHE) is the single state agency responsible for administration of the Medicaid

---

1. This case is related to *Doe v. Mid South Nursing Homes, Inc., et al.*, Civil Action No. 3–87–0760. For a summary of that litigation, *see*

Report and Recommendation of the Magistrate, March 18, 1988 at 31–32.

program. *See* 42 U.S.C. § 1396a(a)(1) and (5). (1082 and Supp.1987). The Department is administered under the direction of the defendant Commissioner.

Tennessee's Medicaid program covers nursing home treatment at both the intermediate care and skilled nursing levels of services. ICF services, as defined in 42 U.S.C. § 1396d(c) and (d), include institutional, health-related services above the level of room and board, but at a level of care below that of hospital or SNF care. *See also* 42 C.F.R. § 440.150. SNF care consists of institutional care above the level of ICF services but below the level of a hospital. 42 U.S.C. § 1396d(i); 42 C.F.R. § 440.-40.

An individual's eligibility for coverage under the Tennessee Medicaid Program is determined on the basis of certain personal characteristics relating to need such as old age, disability or blindness, and on the basis of the person's indigency, measured by certain State and federal financial standards. To obtain Medicaid coverage for nursing home care the patient must first establish financial eligibility and then meet additional medical need requirements demonstrating eligibility for ICF or SNF services. The medical requirements, established by the State pursuant to 42 U.S.C. § 1396a(a)(30), are for the purpose of safeguarding against unnecessary treatment.

In order to determine a patient's medical eligibility, Tennessee requires that each Medicaid recipient's need for admission to a nursing home be evaluated prior to the recipient's admission to the institution or, if the patient has already been admitted, prior to an authorization of Medicaid reimbursement for his or her care. *See* 42 C.F.R. §§ 456.271 and 456.372; and THDE §§ 1200–13–1–10 and 1200–13–1–13. This process is referred to as the pre-admission evaluation (PAE) process.

Once a patient has been admitted to a nursing home, his or her continued need for ICF or SNF care is annually reviewed by State Medicaid officials pursuant to a process referred to as utilization review which is required pursuant to 42 U.S.C. § 1396a(a)(30).

Pursuant to 42 U.S.C. § 1396a(a)(33), TDHE is responsible for establishing a plan, consistent with federal regulations, for:

(A) ... the review by appropriate personnel of the appropriateness and quality of care and services furnished to recipients of medical assistance ...; and [for]

(B) the function of determining whether institutions and agencies meet the requirements for participation in the program [as health care providers] ...

42 U.S.C. § 1396a(a)(33); *see also* 42 C.F.R. § 442.

Federal law authorizes State agencies who perform this survey and certification function to certify facilities for either SNF or ICF reimbursement. Such certification may be of a "distinct part of an institution." *See* 42 U.S.C. § 1395x (federal Medicare statute recognizing "distinct part" certification) and 42 U.S.C. § 1396a(a)(28) (applying "distinct part" certification to Medicaid SNF certification). The Department of Health and Human Services, Health Care Financing Administration in its "Medicare/Medicaid State Operations Manual" has defined "distinct part" certification as follows:

The term "distinct part" denotes that the unit is organized and operated to give *a distinct type of care within a larger organization which otherwise renders other types or levels of care.* "Distinct" denotes both organizational and physical distinctness. A distinct part SNF must be physically identifiable and be operated distinguishably from the rest of the institution. *It must consist of all the beds within that unit such as a separate building, floor, wing or ward.* Several rooms at one end of a hall or one side of a corridor may be accepted as a distinct part SNF.

In each case, however, all the patients of the distinct part would have to be located in units which are physically separate from those units housing all other patients of the institution. Various beds scattered throughout the institution would not comprise a unit operated dis-

tinguishably for purposes of being certified as a SNF.

HCFA *Medicare/Medicaid State Operations Manual,* § 2110, Exhibit 19 (emphasis added) [hereinafter State Operations Manual].

On September 7, 1989 the Health Care Financing Administration (HCFA) of the Department of Health and Human Services, which administers the Medicare and Medicaid programs at the federal level issued an interim final rule revising current Medicare regulations relating to "swing beds." Swing beds are beds operated by acute care hospitals but providing intermediate or skilled level nursing facility, rather than inpatient hospital, care.

The new interim rule is irrelevant to this litigation. However, the supplementary information which accompanies the regulation provides an instructive reaffirmation of federal policies on "distinct part" certification under Medicaid. The explanatory material provided by HCFA confirms that Tennessee's lassiez faire approach to certifying any beds, and only those beds, which a nursing home operator directs it to certify, is squarely at odds with federal "distinct part" requirements:

Hospitals participating in Medicare and Medicaid, in addition to providing an inpatient hospital level of care, may also provide SNF or ICF levels of care through the establishment of a separately participating "distinct part" unit. Among health, safety and other requirements, *a distinct part SNF or ICF must be an entire separately identifiable unit consisting of all the beds within that unit (such as, a separate building, floor, wing, or corridor).* A distinct part SNF or ICF unit is paid as an entity separate from the rest of the institution [54 Federal Register 37, 270 (September 7, 1989) ] (emphasis added).

Furthermore, by regulation, an ICF distinct part can only be certified as "part of a facility *other than an intermediate care facility* [and] if the distinct part:

(1) Meets all requirements for an intermediate care facility;

(2) Is an identifiable unit, such as an entire ward or contiguous ward, a wing, floor, or building;

(3) Consists of all beds and related facilities in the unit;

(4) Houses all recipients for whom payment is being made for intermediate care facility services ...;

(5) Is clearly identified; and

(6) Is approved in writing by the survey agency.

42 C.F.R. § 440.150(d) (emphasis added).

Finally, an ICF distinct part must "[house] all ICF ... residents in the institution", *see State Operations Manual, supra* at 7, and a facility is restricted in its ability to change the size of the certified distinct part unit during an accounting year. U.S. Dept. of Health, Education and Welfare, Office of Nursing Home Affairs, *State Survey Agency Long Term Care Manual,* pp. 38–39 [Exhibit 30, pp. 112–13].

A. *The Tennessee Medicaid Program*

Tennessee participates in the federal Medicaid program to provide medical assistance to those recipients who are determined to be eligible to receive such assistance in accordance with the requirements of Title XIX of the Social Security Act. *See* Tenn.Code Ann. § 71–5–102. TDHE and its Commissioner are designated by statute as the administering agency to implement the State Medicaid plan. Tenn. Code Ann. § 71–5–104. The types of medical assistance that are provided under the Tennessee Medicaid program include, among others, services by skilled nursing home facilities and intermediate care facilities. Tenn.Code Ann. § 71–5–107. TDHE also acts as the State licensing agency for nursing homes or long term care facilities and certifies such facilities for Medicaid. TDHE inspects long term care facilities to ascertain that they are in compliance with State regulation and federal law.

Furthermore, under the Tennessee Medicaid program, TDHE standards for admission to a SNF or ICF are as follows:

(1) Generally admissions to the facilities should be in the order that the referral

was received by the facility as shown on the wait list.

(2) Documentation justifying deviation from the order of the wait list must be maintained for inspection by the Department. Deviation may be based upon medical need, or valid, consistent facility administrative policy.

(3) In the event of deviation as a result of medical need, documentation should include a narrative description of medical circumstances showing the exigent or particular need of the applicant.

Docket Entry No. 22, Exhibit 2. Also, for certification of nursing homes under the Medicaid program, there are the requirements that:

1. All residents are admitted to the facility without discrimination regarding race, color or national origin.

2. The nursing home utilizes its referral sources in a manner which assures an equal opportunity for admission to persons without regard to race, color, or national origin in relation to the population of the service area or potential service area.

Tennessee has previously had a "Medicaid Bed Management Program" which represents an attempt to place a percentage limitation on the number of available Medicaid beds in nursing homes. Federal auditors recommended that this policy be discontinued, and Tennessee abolished this program on October 1, 1985.

Plaintiffs challenge what they refer to as an unwritten limited bed certification policy. Defendants assert that this policy is instead simply Tennessee's version of distinct part certification. The Court finds, however, that the Tennessee policy varies markedly from federal "distinct part" certification.

Perhaps the most fundamental difference between Tennessee's limited bed certification policy and federal "distinct part" certification is to be found in the different purposes served by the respective policies. Federal distinct part certification is intended to accommodate the delivery of qualitatively different types of health care within the same facility. Tennessee's policy, however, appears to serve the interests of nursing homes who wish to participate in the Medicaid program while also maintaining a separate private pay facility offering the same type of care.

Consequently, the federal distinct part and State "limited bed" certification policies diverge sharply in their characteristics and implementation. Although federal regulations permit a distinct part ICF to be certified *only in facilities other than ICFs*, Tennessee will, at the provider's instructions, certify a limited component of beds in a facility which provides the same ICF level of care in all beds, certified and non-certified alike. Thus, under State policy the certified portion of a facility need not house all ICF residents in the institution as required by the State Operations Manual.

In contrast to federal requirements, the State certifies beds which are not in a separately administered unit of a facility, but are instead part of a wing or hallway that also contains non-certified beds. *See Damall Testimony*, Transcript pp. 102–108. At the request of a nursing home facility, even a single bed in a semi-private room will be "spot certified" although it might be in a unit which is otherwise made up entirely of non-certified beds providing the same level of care. While the State asserts it generally engages in spot certification only in the interest of a patient who has exhausted his or her private resources and to prevent a transfer, the Court finds that the facility would not need to request spot certification if, as is required by federal law, the entire ICF portion of a single institution were Medicaid certified.

Federal Medicaid law mandates that states set their Medicaid payments to nursing homes at levels which are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations and quality and safety standards ..." 42

U.S.C. § 1396a(a)(13)(A).[2]

By contrast, private pay rates are set by the market, a market in which there are more patients seeking care than there are beds to accommodate them. There are waiting lists to gain admission to nursing homes throughout Tennessee. As a result of this situation, unregulated private pay rates are substantially higher than Medicaid payments, and nursing home operators prefer private pay patients. Tennessee's present certification program allows nursing home operators to give preference to private pay patients by reserving for their exclusive use beds which are, due to lack of certification, unavailable to Medicaid patients.

The effects of the limited bed certification policy take a number of different forms. The policy leads to disruption of care and displacement of Medicaid patients after they have been admitted to a nursing home. Such displacement often occurs when a patient exhausts his or her financial resources and attempts transition from private pay to Medicaid. In this situation, a patient who already occupies a bed in a nursing home is told that his or her bed is no longer available to the patient because he or she is dependent upon Medicaid. Furthermore, displacement also occurs when patients at the SNF level who are covered by Medicare, the Veterans Administration or private insurance, transfer to the ICF level of care where they are dependent on Medicaid because their prior coverage does not cover intermediate care. Involuntary transfers are triggered on other occasions when a patient already on Medicaid at an SNF level of reimbursement is reclassified to an ICF level of care.

Despite the State's assertions that complaints of improper or involuntary transfers have been rare, and when such complaints have been raised, they have been promptly resolved, the Court finds that the limited bed certification policy has caused widespread displacement. Furthermore, the Court finds that the patients and their families faced with the displacement situation are often under the impression that the State itself has caused the displacement and is unlikely to seek help from the State against the nursing home who appears to be "on their side." The Court is persuaded by the depositions, affidavits and exhibits concerning the severe impact of the limited bed certification policy. Finally, the Court is mindful of the Medicaid eligibility rules which allow eligibility for relatively more affluent patients already residing in nursing homes than those seeking initial admission. This phenomenon combined with the limited bed certification policy often renders the poorest and most medically needy Medicaid applicants unable to obtain the proper nursing home care.

### B. *Disparate Impact on Minorities*

The Court finds that the plaintiff has established by a preponderance of the evidence that the Tennessee Medicaid program does have a disparate and adverse impact on minorities. Because of the higher incidence of poverty in the black population, and the concomitant increased dependence on Medicaid, a policy limiting the amount of nursing home beds available to Medicaid patients will disproportionately affect blacks.

Indeed, while blacks comprise 39.4 percent of the Medicaid population, they account for only 15.4 percent of those Medicaid patients who have been able to gain access to Medicaid–covered nursing home services. In addition, testimony indicates that the health status of blacks is generally poorer than that of whites, and their need for nursing home services is correspondingly greater. Finally, such discrimination has caused a "dual system" of long term care for the frail elderly: a statewide system of licensed nursing homes, 70 percent funded by the Medicaid program, serves whites; while blacks are relegated to substandard boarding homes which receive no Medicaid subsidies.

### CONCLUSIONS OF LAW

A. *The Challenged Policy Violates Federal Medicaid Statutes and Regulations Relating to Nursing Home Survey and Certification*

The objective of the nursing home survey and certification process established

---

**2.** The adequacy of Medicaid reimbursement rates, however, is not at issue here.

by 42 U.S.C. § 1396a(a)(33) is the protection of nursing home patients and enforcement of their statutory entitlement to high-quality care. *See Estate of Smith v. Heckler,* 747 F.2d 583 (10th Cir.1984). Tennessee's limited bed certification policy subverts the accomplishment of this statutory purpose and transforms the survey and certification process into an instrument for denying patients' access to the medically necessary care to which they are entitled.

The State's policy offends not only the purpose of the federal statute, but also its literal language. Subsection (B) of 42 U.S.C. § 1396a(a)(33) requires the State Medicaid agency to determine "whether institutions and agencies"—not parts thereof—meet the *requirements for participation* in the Medicaid program. The State must certify the facility in its entirety if it meets federal criteria, or deny certification if it has "good cause." 42 C.F.R. § 442.12. The State cannot, however, withhold certification of part of the facility.

Although Title XIX does not protect recipients' right to remain in unqualified nursing homes at Medicaid's expense, it does confer:

> the right to choose among a range of *qualified* providers, without government interference. By implication, it also confers an absolute right to be free from government interference with the choice to remain in a home that continues to be qualified. *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (emphasis in original).

Tennessee's policy of limiting the number of beds certified in qualified facilities constitutes precisely the type of interference proscribed by the statute.

■ In its administration of Tennessee' Medicaid program, the Tennessee Department of Health and Environment must "comply with requirements imposed by [Title XIX of the Social Security] Act and by the Secretary of Health and Human Services." *Atkins v. Rivera,* 477 U.S. 154, 157, 106 S.Ct. 2456, 2458, 91 L.Ed.2d 131 (1986). It is of course well-settled that, in construing a complex statute such as Title XIX,

deference should be accorded to interpretations of the law adopted by agencies charged with their administration. Such deference must be accorded, not only to formally promulgated regulations, but also other official pronouncements of agency policy such as manuals and administrative rulings. *Smith v. Miller,* 665 F.2d 172, 179 (7th Cir.1981).

While there are no prior judicial decisions on point, a consistent line of administrative rulings by HCFA holds that a policy of certifying less than all of a Medicaid-participating facility's beds is contrary to federal law and regulations. *See* Memorandum of August 22, 1983 from HCFA's Director, Bureau of Eligibility, Reimbursement and Coverage, to the HCFA Regional Administrator of Region IV, which includes Tennessee [Exhibit 6]; letter from HCFA Administrator Carolyn K. Davis to B.F. Simmons, dated May 29, 1981, disallowing a Mississippi proposal to impose a statewide cap on the total number of Medicaid-certified beds [Exhibit 7]; HCFA Decision dated 1/14/85, disapproving Mississippi State Plan Amendments 84–6, 84–7, and 84–8 with attached Hearing Officer's Recommended Decision [Exhibit 47]; Letter of 1/27/84 from Carolyn Davis to John LaFara disapproving Montana State Plan Amendments 83–19 and 83–20 [Exhibit 48]; HEFA Notice of Hearing on disapproval of Mississippi State Plan Amendment, 47 Fed. Register 8093–8094 (2/24/82); HCFA Notice of Hearing on disapproval of South Carolina State Plan Amendment, 47 Fed. Register 10,295 (3/10/82) [Exhibit 50]; HCFA Notice of Hearing on disapproval of Missouri State Plan Amendments, 48 Fed. Register 44,-930–44,931 (9/30/83) [Exhibit 51]; and HCFA, "Target Area Report: TDHE Medicaid Bureau Administration of Long Term Care Services" (4/15/85–5/2/82) [Exhibit 60]. Significantly, this body of authority includes HCFA's recommendation that Tennessee abolish its former Medicaid Bed Management Program, for reasons that are equally applicable to the current limited bed certification policy. The State contends that HCFA's concern with respect to limited bed policies has been primarily directed toward percentage or numerical

caps on the number of beds. The Court finds that Tennessee's current policy has the same purpose and problems of the so-called percentage limitations and thus violates the HCFA policy.

Although TDHE has never reduced its policy to writing or submitted it to HCFA for approval, TDHE contends that its policy is consistent with federal "distinct part" regulations and HCFA directives. The Court finds that the State's policy simply does not meet the requirements of "distinct part" certification as enumerated in federal regulations and HCFA directives.

The State also defends the limited bed certification policy on the basis that it is consistent with the voluntary nature of provider participation in the Medicaid system and warns that if the policy is eliminated, a number of nursing home facilities who presently participates in Medicaid-covered services are likely to opt out of the system. *See* Defendant's Proposed findings of Fact and Conclusions of law, pp. 14–17. It is the Court's opinion that even if some Tennessee nursing home facilities "opt out", the weight of the evidence establishes that the vast majority of nursing homes are dependent on Medicaid funding in order to operate and are likely to continue to participate in the system. *See* Deposition of M. Catherine Hawes, Plaintiff's Exhibit 1, January 27, 1989. Furthermore, of those nursing home facilities that choose not to participate in Medicaid, many are retirement communities in which nursing home care is paid by the resident's entrance fee, while others tend to be smaller facilities not meeting other Medicaid regulations such as fire and safety standards. Thus, just as compliance with Medicaid fire safety standards, quality of care standards, and patient protection standards involves some cost or inconvenience, so too does compliance with basic Medicaid requirements. Nonetheless, the Court shall conduct a further hearing to consider as part of the overall formulation of an appropriate remedy, what prophylactic steps, if any, should be taken to prevent or mitigate provider attrition.

B. *Plaintiffs' Claims Under Title VI of the Civil Rights Act of 1964*

■ Title VI of the Civil Rights Act of 1964 provides, in relevant part:

No person in the United States shall on the ground of race, color or national origin ... be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Regulations under Title VI provide that a state in its administration of the federally funded program can not:

... directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color or national origin.

45 C.F.R. § 80.3(b)(2).

The Supreme Court decisions that interpret Title VI proscribe state policies and practices that have racially disparate and discriminatory effects. In *Guardians Ass'n v. Civil Service Commn.*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), the Supreme Court held that Title VI reaches unintentional disparate impact discrimination as well as deliberate racial discrimination. However, unless discriminatory intent is shown, declaratory and injunctive relief should be the only available remedies for Title VI violations. However, as explained in the Supreme Court's subsequent decision in *Alexander v. Choate:*

In *Guardians,* we confronted the question whether Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.,* which prohibits discrimination against racial and ethnic minorities in programs receiving federal aid, reaches both intentional and disparate-impact discrimination. No opinion commanded a majority in *Guardians,* and Members of the Court offered widely varying interpretations of Title VI. Nonetheless, a two-pronged holding on the nature of the discrimination proscribed by Title VI emerged in

that case. First, the Court held that Title Vi itself directly reached only instances of intentional discrimination. Second, the Court held that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI. In essence, then, we held that Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impacts upon minorities constituted sufficiently significant social problems, and were readily enough remediable, to warrant altering the practices of the federal grantees that had produced those impacts. [footnotes omitted].

469 U.S. 287, 292–94, 105 S.Ct. 712, 716, 83 L.Ed.2d 661 (1985).

The plaintiffs have shown that the defendants' limited bed certification policy has a disparate impact on racial minorities in Tennessee. The burden of proof next falls upon the defendants to show that the disparate impact is not unjustifiable. The defendants state that the "self-selection preferences" of the minorities, based upon the minorities reliance upon the extended family, lack of transportation, and fear of institutional care, adequately explain the disparate impact. *See, Defendants' Proposed Findings of Fact and Conclusions of Law*, at p. 20. This explanation, however, is not sufficient justification for minority underrepresentation in nursing homes. Therefore, the defendants have failed to meet their burden of proof under *Alexander v. Choate.*

Because past racial discrimination was the product "of invidious animus ... rather than thoughtlessness and indifference", *Alexander v. Choate*, 469 U.S. at 296, 105 S.Ct. at 717, statistical evidence of disparate racial impact of state policies in federally funding programs can establish liability under Title VI for declaratory and injunctive relief, if the agency has not addressed them. *Guardians Ass'n v. Civil Service Commn. of New York*, 463 U.S. at 592–93, 103 S.Ct. at 3227–28. *See also Weathers v. Peters Realty*, 499 F.2d 1197, 1201–02 (6th Cir.1974). The Court is convinced that the Tennessee limited bed certification policy has had a disparate adverse impact on black Medicaid recipients in Tennessee. Furthermore, provider agreements which permit providers to serve Medicaid patients in only a limited number of their available beds are invalid under Medicaid regulations codified at 42 C.F.R. § 442.12(d)(2):

> A provider agreement is not a valid agreement for purposes of this part, even though certified by the State survey agency, if the facility fails to meet the civil rights requirements set forth in 45 C.F.R. Parts 80, 84, and 90.

■ The Court recognizes that under Title VI, deference is accorded to the Title VI administrative agency to cure the discriminatory effects of the particular program. To be sure, THDE employs Ms. Beverly Bass as a director to monitor Title VI compliance. However, even Bass concedes that under the TDHE certification policy black Medicaid recipients are displaced or denied admission to nursing homes. Further, it is noteworthy that the Bed Management Program that was instituted in 1981, was not repealed as TDHE policy until October 13, 1987. Prior TDHE studies identified the status of minority citizen in Tennessee's Medicaid Program and the reasons for lack of minority participation. Yet, despite these studies, the Commissioner implemented a policy that fosters and continues the egregious status of minority Medicaid patients within the program. In these circumstances, continued deference to the administrative agencies is inappropriate. To cure the effects of this policy, judicial intervention is necessary. To accomplish this, the Court ORDERS the Commissioner, in consultation with the HCFA, to submit a plan for court approval that will redress the disparate impact upon eligible minority Medicaid patients' access to qualified nursing home care due to the THDE certification policy and the State's past noncompliance with Title VI.

## C. *Other Statutory Requirements*

In addition to violating the federal Medicaid statutes, regulations, and HCFA policy directives relating to nursing home

survey and certification, the Court holds that the challenged limited bed certification policy also violates the following statutes and regulations:

■ (1) 42 C.F.R. § 431.10(e)(1) which provides that TDHE, as the single state Medicaid agency:

must not delegate, to other than its own officials, authority to—

(i) Exercise administrative discretion in the administration or supervision of the plan, or

(ii) Issue policies, rules and regulations on program matters.

■ (2) 42 U.S.C. § 1396a(a)(23) and 42 C.F.R. 431.51(a) which provides that TDHE must administer the program in a manner which ensures "that recipients may obtain services from any qualified Medicaid provider;"

■ (3) 42 C.F.R. § 440.240 which requires that the agency must ensure compliance with State Medicaid Plan provisions which mandate

(a) that the services available to any categorically needy recipient under the plan are not less in amount, duration and scope than those services available to a medically needy recipient; and

(b) that the services available to any individual in the following group are equal in amount, duration and scope for all recipients within the group:

(1) The categorically needy;

(2) A covered medically needy group;

■ (4) the utilization control mechanism pursuant to 42 U.S.C. § 1396a(a)(30) which safeguards against unnecessary utilization of medical care and services by causing increased illness, transfer trauma and displacement;

■ (5) 42 C.F.R. § 440.230(b) which requires that State limitations of services covered by Medicaid must be such that those services, including nursing home call, are adequate in amount, scope, and duration to reasonably achieve their purpose of meeting the medical needs of recipients;

■ (6) 42 U.S.C. § 1396a(a)(19) which imposes on Tennessee a duty to:

provide such safeguards as may be necessary to assure that eligibility for care and services under the [Medicaid] plan will be determined, and such care and services will be provided in a manner consistent with simplicity of administration and the best interests of the recipients;

■ (7) 42 C.F.R. § 447.204 which requires that covered services, including nursing home care, must be available to the extent that those services are available to the general population, and

■ (8) 42 U.S.C. § 1396a(a)(8) which requires states to ensure that medical assistance will "be furnished with reasonable promptness to all eligible individuals." The limited bed policy has caused Medicaid patients to experience extended delays and waiting lists in attempting to gain access to long term nursing home care.

## CONCLUSION

In light of the foregoing reasons, the Court declares the State's limited bed certification policy invalid. A further hearing shall be scheduled for the purpose of formulating an appropriate remedy.

## SUMMARY

Plaintiffs challenge the State of Tennessee's practice of allowing nursing homes in Tennessee to certify less than all of their beds as available to Medicaid patients. The Court hereby declares such policy in violation of Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. The Court hereby ORDERS a further hearing to determine an appropriate remedy, and ORDERS the Commissioner, in consultation with HCFA, to submit a plan for Court approval that will redress the disparate impact on minority Medicaid patients' access to qualified nursing home care.

An Order will be entered in accordance with the reasoning set forth in this Memorandum.