Reda Z. SOBKY, M.D., PhD., et al., Plaintiffs,

v.

Sandra R. SMOLEY,[1] et al., Defendants.

Civ. No. S–92–613 DFL GGH.

United States District Court, E.D. California.

June 14, 1994.

---

1. Defendant Smoley has been substituted for Russell S. Gould in her official capacity as Secretary of the California Health and Welfare Agency.

The other defendants also are health officials of the State of California sued in their official capacities.

Amitai Schwartz, San Francisco, CA, for plaintiffs.

Joseph Owens Egan, Attorney General's Office, State of Cal., Sacramento, CA, for defendants.

## AMENDED MEMORANDUM OF DECISION AND ORDER

LEVI, District Judge.

Plaintiffs are providers and recipients or potential recipients of Medi–Cal funded drug abuse treatment services.[2] Plaintiffs claim that the State of California is administering its federally funded Medi–Cal drug abuse program under an administrative and statutory scheme that fails to comply with the requirements of Title XIX of the Social Secu-

rity Act, 42 U.S.C. §§ 1396 *et seq.* (the "Medicaid Act"). In particular, plaintiffs object to the State's practice of allowing the counties to determine whether and in what amount to provide Medi–Cal funded methadone maintenance treatment services. Plaintiffs contend that as a result of this system methadone maintenance is wholly unavailable under Medi–Cal for residents of some California counties. Moreover, in counties where treatment is available, plaintiffs aver that the level of service provided is insufficient to meet the need and that patients are placed on waiting lists for Medi–Cal funded "treatment slots." In contrast, other Medi–Cal covered services are available upon presentment of a Medi–Cal card to a licensed provider. Plaintiffs seek injunctive relief through this action brought under 42 U.S.C. § 1983. This Amended Memorandum of Decision and Order, issued upon plaintiffs' further motion for summary judgment and motion for reconsideration, supersedes the court's previous opinion of October 26, 1993.

### I. *Background*

The federal Medicaid program provides federal funds to states to pay for medical treatment for the needy.[3] *Schweiker v. Gray Panthers,* 453 U.S. 34, 36, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460 (1981). State participation is optional, but states that choose to participate must submit a state plan that fulfills the requirements of the Medicaid Act. 42 U.S.C. § 1396a(b). For a state plan to be approved, the plan must comply with 58 conditions set forth in 42 U.S.C. § 1396a(a). California has elected to participate in the federal Medicaid program through its California Medical Assistance Program, known as "Medi–Cal," which provides medical services to the aged, disabled, and indigent.[4]

**2.** In an order filed on December 14, 1992, this case was consolidated with *Merritt v. Belshe,* Civ. S–92–1905. The parties stipulated to certification of a plaintiff class defined as "all persons in the State of California eligible for Medi–Cal for whom methadone maintenance treatment is medically necessary and otherwise appropriate but who are, or may be in the future, unable to obtain methadone maintenance treatment through the Medi–Cal program."

**3.** The Medicaid Act was enacted as Title XIX to the Social Security Act ("SSA") in 1965 in order to establish a single and separate medical care

program to replace medical programs already existing in five different titles of the SSA. *See* H.R.Rep. No. 213, 89th Cong., 1st Sess. (1965), *reprinted in* Robert B. Stevens, *Statutory History of the United States: Income Security* 736 (1970).

**4.** In California, Medi–Cal is available to the "categorically needy," which includes public assistance recipients and persons receiving Supplemental Security Income ("SSI"), as well as to the "medically needy," which includes certain individuals whose income is insufficient to meet the cost of necessary medical treatment. Cal. Welf. & Inst.Code §§ 14005–14005.7. "Medical-

*Citizens Action League v. Kizer,* 887 F.2d 1003, 1005 (9th Cir.1989), *cert. denied,* 494 U.S. 1056, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990); Cal.Welf. & Inst.Code §§ 14000–14196.

■ Federal law does not require that states provide methadone maintenance services in their Medicaid plans. It is an optional service. But once a state elects to provide an optional service such as methadone maintenance, that service becomes part of the state Medicaid plan and is subject to the requirements of federal law. *Weaver v. Reagen,* 886 F.2d 194, 197 (8th Cir.1989); *Eder v. Beal,* 609 F.2d 695, 701–02 (3d Cir. 1979); *Clark v. Kizer,* 758 F.Supp. 572, 575 (E.D.Cal.1990), *aff'd in part and vacated in part on other grounds sub nom., Clark v. Coye,* 967 F.2d 585 (9th Cir.1992) (table); *see also King v. Smith,* 392 U.S. 309, 316, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968). Methadone maintenance is one of several drug abuse treatment services offered as part of California's "Drug/Medi–Cal" program.[5] Cal.Welf. & Inst.Code §§ 14021(c), 14021.5 & 14131; Cal.Code Regs. tit. 22, § 51341; Dep. of Venus Little, 34:24–35:1.

Medi–Cal is generally administered on a "fee-for-service" basis by the California Department of Health Services. To receive services, Medi–Cal recipients present Medi–Cal cards to certified providers of authorized treatments or services. Cal.Welf. & Inst. Code § 14018; Cal.Code Regs. tit. 22, §§ 50731 & 50733(a); *see also* Defs.' Statement of Material Facts, ¶ 7.[6] The provider then bills the State a pre-established fee for that service. Defs.' Statement of Material Facts, ¶ 8. The Medi–Cal card is "authorization for payment for Medi–Cal covered services received in any California county." Cal.Code Regs. tit. 22, § 50735(a). In the

fee-for-service scheme, the counties' role is primarily to determine recipients' eligibility in accordance with State regulations. *Id.* § 50101.

Methadone maintenance is a method of treating dependence on opiates, including heroin. Methadone is a synthetic drug that relieves the symptoms of opiate withdrawal, and is itself addictive. Maintenance treatment includes prescription of methadone under medical supervision, drug screening, therapy, and vocational and substance abuse counselling. 21 C.F.R. §§ 291.505(a)(2) & 291.505(d)(4)(i)(A); Cal.Health & Safety Code § 11880. The ultimate goal of the treatment is to eliminate all dependence on drugs. *Id.* § 11880. Methadone maintenance providers are licensed for a maximum treatment capacity (called "treatment slots") by the California Department of Alcohol and Drug Programs (the "Department of Alcohol and Drug Programs" or the "Department") which acts after receiving a recommendation from the county in which the provider seeks to operate. *Id.* § 11877; Cal.Code Regs. tit. 9, §§ 10026, 10040 & 10045; Decl. of Joy Jarfors, ¶ 3. No provider may treat more than 300 patients at a time. Cal.Code Regs. tit. 9, §§ 10026(b) & 10145(b). To receive treatment, patients must meet federal and state eligibility criteria, for example, patients must have a documented history of at least two years of narcotic addiction. 21 C.F.R. § 291.505(d); Cal.Code Regs. tit. 9, § 10174.

California's Medicaid plan governing the provision of drug abuse treatment services consists of an interagency agreement between the Department of Health Services and the Department of Alcohol and Drug Programs. *See* Defs.' Ex. 1. Under the agreement, provision of Medi–Cal funded methadone maintenance treatment is inte-

---

ly needy" recipients are required to pay a share of the cost of their medical treatment. *Id.* §§ 14005.7–14005.9. The Medicaid Act defines "categorically needy" and "medically needy" individuals in the same way as the Medi–Cal program. *See* 42 U.S.C. § 1396a(a)(10)(A).

5. "Drug/Medi–Cal" is the term used by the State to designate its Medi–Cal funded drug abuse treatment services. In addition to methadone maintenance, the other Drug/Medi–Cal services reimbursable under California's Medicaid plan

are "drug free treatment," "day care habilitative treatment," and "naltrexone treatment." Defs.' Ex. 1.

6. Defendants filed two lists of material facts in support of their opposition to plaintiffs' first motion for summary judgment. The reference in the text is to the statement titled "State Defendants' Statement of Material Facts as to which there is a Genuine Issue Precluding Summary Judgment," which lists both disputed and undisputed facts.

**1128**

grated into California's separate statutory scheme governing drug abuse services. The key feature of California's drug abuse scheme is that services are administered through locally controlled community drug abuse programs, in which each individual county is vested with the discretion to determine the appropriate mix and level of drug abuse services needed in the community.[7] Cal.Health & Safety Code § 11960; Defs.' Opp'n to first Summ.J.Mot. at 9–10. Each county may, but is not required to, seek funds allocated by the Department of Alcohol and Drug Programs for the purpose of alleviating drug abuse problems within its jurisdiction. Cal.Health & Safety Code § 11981. The Department annually estimates the total amount of State and federal funds available to each county for drug abuse services. *Id.* § 11983. Each county then prepares its own drug program plan, subject to State approval, which specifies the particular amount and type of drug abuse services which will be offered in that county. *Id.* §§ 11983.2 & 11983.1. Counties may choose to include any of the Drug/Medi–Cal services, including methadone maintenance, in their plans. If they do, State "matching" funds for the Drug/Medi–Cal services are deducted from the State general fund monies already allocated to the county for its drug programs. *Id.* § 11987.3.[8] If the county chooses not to include Drug/Medi–Cal services in its plan, then all of the State general fund monies allocated to the county are available for other services specified in the county's drug program plan.[9] *Id.* §§ 11987.3 & 11987.4; *see also* Dep. of Dana Kueffner, 30:14–35:15; Dep. of Robert Lefkin, 40:11–47:5, 48:24–49:14.

Based on the amount of money allocated in the county plan to methadone maintenance, the counties contract with methadone maintenance providers for a specific dollar amount of treatment services, which in turn translates into a number of available Medi–Cal funded "treatment slots." [10] Cal.Welf. & Inst.Code § 14021(c); Decl. of Donald Nikkel, ¶¶ 5–7; Kueffner Dep., 53:1–55:5.

As a result of this system, Medi–Cal methadone maintenance services are available only in those California counties that elect to receive Medi–Cal funds for that purpose.[11] Defs.' Statement of Disputed Facts, ¶ 14. Only 18 of the 58 counties in California have elected to fund Medi–Cal methadone maintenance. Def. Molly Joel Coye's Resp. to Pls.' Second Set of Interrogs., No. 4. In all but eight of the non-participating counties, there is no certified methadone maintenance provider for either Medi–Cal recipients or private pay patients. Jarfors Decl., ¶ 7.[12] In

7. Before this action was filed, Alameda County decided to eliminate most methadone maintenance services from its county drug program plan. In response, in September 1992, the Department of Alcohol and Drug Programs took over the administration of Medi–Cal methadone maintenance services in Alameda County. The State, through the Department, now contracts directly with Alameda County methadone maintenance providers.

Although these events have mooted plaintiffs' claims against Alameda County officials, the remaining 57 counties in the State continue to operate under the decentralized system described in the text.

8. Under the Medicaid Act, the federal government reimburses the states for a portion of the cost of the states' Medicaid programs. The states' share of the cost is referred to as state "matching funds." 42 U.S.C. § 1396b; *Charleston Memorial Hosp. v. Conrad*, 693 F.2d 324, 326 (4th Cir.1982).

9. However, the county must "match" 10 to 15 percent of the funds not spent on Drug/Medi–Cal services. *Id.* § 11987.4.

10. Apparently, the dollar limit on services specified in the contracts with providers is subject to increase during the course of the contract period. Decl. of Venus Little, ¶ 6; Decl. of Donald Nikkel, ¶ 8. The defendants, however, do not identify or describe the process through which additional funds are sought and provided. *See* Defs.' Statement of Material Facts, ¶ 18.

11. County discretion to determine the amount of their State general fund allocation to devote to Drug/Medi–Cal services is subject to the Department's approval of county drug program plans. Cal.Health & Safety Code § 11983.1. The record reveals one instance where State oversight was invoked—in Alameda County, as described in note 7 *supra*.

12. There is some conflict in the record. The Department's "Methadone Program List," dated September 7, 1992, lists 24 counties with licensed methadone maintenance providers—18 of which offer Medi–Cal funded treatment and six which do not. Pls.' Ex. 21; *see also* Def. Molly Joel Coye's Resp. to Pls.' Second Set of Interrogs., No. 4. In contrast, the Jarfors declaration

the eight—which includes Sonoma, San Diego, Ventura, Santa Barbara, Kern, and San Luis Obispo Counties—certified methadone maintenance providers serve private pay patients and patients subsidized under other programs, such as federal block grants, but do not receive any funding through Medi–Cal. Lefkin Dep., 49:5–14, 50:10–13.

If a county does not provide Medi–Cal methadone maintenance services, or if the county provides the service but the available "slots" are filled, then a Medi–Cal eligible individual cannot receive the service in that county under Medi–Cal. Little Dep. at 27–29, 47. Although the practice is contrary to State policy,[13] see Pls.' Ex. 18, at least two counties include clauses in their provider contracts prohibiting providers from serving Medi–Cal patients who reside in other counties. Decl. of Brian Slattery, ¶ 7; Dep. of Richard Earle Brown, Jr., 30:21–31:2, 43:22, 65:5–66:7, 111:10–19.[14]

Plaintiffs have established that some methadone maintenance providers receive an insufficient number of treatment slots to serve all the Medi–Cal eligible in need of treatment; in response, some providers have created waiting lists for the Medi–Cal funded slots. Nikkel Decl., ¶¶ 8, 9, 11; Slattery Decl., ¶ 10; Kueffner Dep., 100:13–101:6; Dep. of Reda Z. Sobky, 35:1–6, 37:23–38:1. Plaintiffs also have submitted declarations from several Medi–Cal eligible methadone maintenance patients who are unable to obtain Medi–Cal services because of their coun-

ty of residence, or who were obtaining services but were terminated from Medi–Cal funded treatment slots due to insufficient Drug/Medi–Cal funding. Decls. of Douglas Lipman, Vicki Manahl, Sharon McCloud, Lisa Quilling, Terri Randall, Heather Randolph, Paul Sanchez, Jodi Sollenberger. These persons are "categorically needy" within the meaning of 42 U.S.C. § 1396a(a)(10)(A) because they receive Aid to Families with Dependent Children ("AFDC") or because they receive SSI. See id. Unlike other categorically needy persons and some "medically needy" individuals who receive methadone maintenance treatment through Medi–Cal, see Decl. of Anne Bolla; Second Decl. of Amitai Schwartz (incorporating letter from Ron Kletter), these members of the plaintiff class must either privately pay for methadone maintenance or forego treatment while they wait for Medi–Cal funded treatment slots to become available. As a result, they have suffered consequences such as homelessness, exposure to disease, medical complications resulting in hospitalization, and the risk of probation revocation.[15] Decls. of Douglas Lipman, Vicki Manahl, Sharon McCloud, Lisa Quilling, Terri Randall, Heather Randolph, Paul Sanchez, Jodi Sollenberger; see also Slattery Decl., ¶ 13; Decl. of Ronald K. Perry.

Plaintiffs assert that the State's scheme for providing Medi–Cal funded methadone maintenance treatment violates six requirements of the Medicaid statute: (1) the State's

---

indicates that there are licensed providers in 26 counties.

**13.** In 1990, the Department wrote to county drug program administrators in an effort "to clarify a question which has regularly surfaced regarding the provision of drug treatment services to Drug/Medi–Cal (D/MC) beneficiaries ... because several counties do not participate in the D/MC program." The State informed the counties that "[d]rug treatment programs which have D/MC funding and space (slots) available cannot deny program access to non-county residents which [sic] are D/MC beneficiaries." Pls.' Ex. 18.

**14.** By contrast, "heroin detoxification" treatment, which is a short-term treatment using methadone to achieve detoxification within 21 days, see Cal.Code Regs. tit. 22, §§ 51116 & 51328, is a drug abuse treatment service that is not included in the Drug/Medi–Cal program, but instead is

available under the traditional "fee-for-service" scheme. As a result, detoxification treatment is available upon presentment of a Medi–Cal card to a certified provider. Lefkin Dep., 62:4–25; Defs.' Statement of Material Facts, ¶¶ 9 & 10.

**15.** As one example, plaintiff Lisa Quilling receives $504 per month through AFDC and $140 per month in food stamps for her and her four-year-old son. After her Medi–Cal methadone maintenance slot was cut, she paid the $225 per month charged for treatment and could no longer afford to pay her rent of $475 per month. She avers that she was evicted as a result and is now homeless. Because of her medical condition, her doctors have advised her to continue with methadone maintenance treatment. She states that she has been unable to find a job, an apartment she can afford, or Medi–Cal funded treatment in another clinic. Quilling Decl., ¶¶ 2, 5, 8, 9, 10, 12, 13, 14, 16 & 17.

Medicaid plan must be in effect statewide, 42 U.S.C. § 1396a(a)(1); (2) payments to providers must be sufficient so that Medi–Cal recipients receive comparable services as the general population in the geographic area, *id.* § 1396a(a)(30); (3) the State's Medicaid plan must provide medical assistance to categorically needy individuals that is equal in amount, duration, and scope to the assistance provided to other categorically needy persons and at least equal in amount, duration, and scope to the assistance provided to medically needy persons, *id.* § 1396a(a)(10)(B); (4) each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose, 42 C.F.R. § 440.230(b); (5) the plan must be administered or supervised by a single state agency, 42 U.S.C. § 1396a(a)(5); and (6) medical assistance under the plan must be furnished to all eligible individuals with reasonable promptness, *id.* § 1396a(a)(8).[16] Plaintiffs seek summary judgment on these claims, or in the alternative, a preliminary injunction invalidating the State scheme.

Defendants seek to dismiss both the *Sobky* and *Merritt* complaints in their entirety.[17]

Defendants assert that plaintiffs have no right of action under 42 U.S.C. § 1983 to enforce the Medicaid plan requirements of the Social Security Act against the State. Further, defendants seek either summary judgment or dismissal as to plaintiffs' claim asserting a violation of due process.

## II. *Jurisdiction*

█ Relief under 42 U.S.C. § 1983 is not limited to federal constitutional violations but also may be based on violations of a federal statute. *Maine v. Thiboutot,* 448 U.S. 1, 6–8, 100 S.Ct. 2502, 2505–06, 65 L.Ed.2d 555 (1980). But because § 1983 is addressed to the deprivation of "rights, privileges or immunities" and not merely the violation of federal law,[18] a plaintiff must show that the federal law violated creates enforceable rights within the meaning of § 1983. *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989).[19]

The two most recent Supreme Court decisions addressing whether a statutory provision creates enforceable rights, *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct.

---

**16.** Plaintiffs move for summary judgment or alternatively for preliminary injunctive relief on claims one, two, three, five, six, seven, and ten of the *Sobky* complaint, and claims one, two, three, four, six, and seven in *Merritt.* With the exceptions of *Sobky* claim ten and *Merritt* claim three, all of these claims assert violations of the six Medicaid plan requirements listed above. *Sobky* claim ten asserts a cause of action for declaratory relief. *Merritt* claim three asserts violations of 42 U.S.C. § 1396a(a)(23), which concerns free choice of providers. Plaintiffs' briefing contains no argument or evidence regarding the § 1396a(a)(23) claim, however, and the court assumes that it was erroneously included within the scope of this motion.

**17.** Defendants' motion to dismiss encompasses five claims which are not included within the plaintiffs' motions. Defs.' Supp.Mot. to Dismiss at 2–3. Four of these five (*Sobky* claims four, eight, and nine, and *Merritt* claim five) assert violations of additional Medicaid state plan requirements. Defendants offer no arguments regarding the merits of the claims and request dismissal only on the basis that plaintiffs have no cause of action to enforce the statutory provisions. However, defendants have failed to specifically analyze the enforceability of each claim asserted, as required by *Suter v. Artist M.,* —— U.S. ——, —— n. 8, 112 S.Ct. 1360, 1367 n. 8, 118 L.Ed.2d 1 (1992) (holding that "each statute

must be interpreted by its own terms"). Because the briefing is inadequate to enable the court to determine whether these four claims should be dismissed, the motion to dismiss is denied as to these claims without further discussion.

**18.** 42 U.S.C. § 1983 provides a right of action against any person who, under of color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws [of the United States]."

**19.** Even if the plaintiff successfully asserts the violation of an enforceable right, the defendant may defeat the cause of action by showing that Congress specifically foreclosed a remedy under § 1983 in the enactment itself—either expressly or by enacting a comprehensive enforcement scheme. *Golden State,* 493 U.S. at 106–07, 110 S.Ct. at 448–49. However, in *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Court found that Congress had not foreclosed enforcement of the Medicaid Act under § 1983. *Id.* at 520–23, 110 S.Ct. at 2523–25. Although the *Wilder* analysis specifically focuses on § 1983 actions by providers, it appears equally applicable to actions brought by Medicaid recipients. In any event, the State does not argue that Congress has foreclosed recipient private rights of action under the Medicaid Act.

2510, 110 L.Ed.2d 455 (1990), and *Suter v. Artist M.,* —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), have led to a degree of uncertainty because of their varying approaches.[20] In *Wilder,* 496 U.S. at 509–10, 110 S.Ct. at 2517, the Court found that § 1396a(a)(13) of the Medicaid Act—which requires a state Medicaid plan to provide for "reasonable rates" of payment for services—created a right enforceable by health care providers against the State under § 1983.[21] *Wilder* applied the analytical framework first set out in *Golden State.* Under this framework, whether an enforceable federal right exists depends, first, on whether the statute in question is "intended to benefit" the plaintiff seeking to enforce it. *Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517. If so, then the provision creates an enforceable right unless it merely expresses a "congressional preference" rather than a binding, mandatory obligation on the state, or unless the interest the plaintiff asserts is " 'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.' " *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 19, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981); *Golden State,* 493 U.S. at 108, 110 S.Ct. at 449). With little or no discussion of jurisdictional issues, a succession of courts, in cases pre-dating *Suter* (and many even pre-dating *Wilder* ), have routinely permitted beneficiary and provider actions under § 1983 to enforce various sections of the Medicaid Act. *See, e.g., King v. Sullivan,* 776 F.Supp. 645 (D.R.I.1991); *Clark v. Kizer,* 758 F.Supp. 572 (E.D.Cal.1990), *aff'd in part and vacated in part on other grounds sub nom., Clark v. Coye,* 967 F.2d 585 (9th Cir.1992) (table); *Linton v. Carney,* 779 F.Supp. 925 (E.D.Tenn.1990); *Morgan v. Cohen,* 665 F.Supp. 1164 (E.D.Pa.1987); *Kessler v. Blum,* 591 F.Supp. 1013 (S.D.N.Y. 1984); *Christy v. Ibarra,* 826 P.2d 361 (Colo. 1991).

In *Suter,* —— U.S. at ——, 112 S.Ct. at 1370, the Court held that child beneficiaries of the Adoption Assistance and Child Welfare Act (the "Adoption Act")[22] could not enforce the requirement that the states use "reasonable efforts" to keep children in their homes. Without explicit reference to the *Golden State/Wilder* approach, the Court returned to its emphasis in *Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1540, that when legislation is enacted under Congress' spending power, conditions imposed on the grant of federal money must be expressed "unambiguously."[23] After *Suter,* the critical inquiry focuses on the specificity of the statutory language; the court must "examine exactly what is required of States" by the enactment. *Suter,* —— U.S. at ——, 112 S.Ct. at 1367. Enforceable federal rights may be found when the statute and any implementing regulations "set forth in some detail" what the state must do to comply, but not when the

20. The facts and reasoning of *Wilder* and *Suter* are thoroughly discussed in the case law, and consequently not repeated here. *See Arkansas Medical Soc'y, Inc. v. Reynolds,* 6 F.3d 519 (8th Cir.1993); *Chan v. City of New York,* 1 F.3d 96 (2d Cir.), *cert. denied,* —— U.S.——, 114 S.Ct. 472, 126 L.Ed.2d 423 (1993); *Clifton v. Schafer,* 969 F.2d 278 (7th Cir.1992); *Stowell v. Ives,* 976 F.2d 65 (1st Cir.1992); *Evelyn V. v. Kings County Hosp. Ctr.,* 819 F.Supp. 183 (E.D.N.Y.1993).

21. *Wilder* involved the enforceability of the Boren Amendment, a different subsection of the same statute at issue here.

22. Like the Medicaid Act, the Adoption Act was enacted by Congress under its spending power contained in Article I, § 8, cl. 1 of the Constitution. *Suter,* —— U.S. at ——, 112 S.Ct. at 1366. The Adoption Act establishes a program to reimburse states for expenses incurred in administering foster care and adoption services in accordance with federal requirements. To receive federal funds, states must submit a plan for the approval of the Secretary of Health and Human Services that meets 16 listed requirements. *Id.* at —— – ——, 112 S.Ct. at 1363–64.

23. The *Suter* opinion includes some language framing the issue more narrowly—that is, whether Congress "unambiguously confer[red] upon [the plaintiffs] a right to enforce the requirement" sought to be enforced. *Suter,* —— U.S. at ——, 112 S.Ct. at 1367. Taken literally, however, such a requirement would foreclose a § 1983 action in every case except where the statute expressly conferred such a right. Given that *Suter* does not overrule *Wilder* or *Golden State,* this language on ambiguity is more reasonably read in light of *Pennhurst,* from which it derives. In *Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1540, it was the *condition* placed on the grant of federal money which was required to be unambiguous, not the conferral of a right of action to enforce the condition. *See Evelyn V. v. Kings County Hosp. Ctr.,* 819 F.Supp. 183, 193 (E.D.N.Y.1993).

method of compliance is left "within broad limits" to the state itself. *Id.* at ——, 112 S.Ct. at 1368. The only unambiguous condition that the Adoption Act placed on the states was to require a plan approved by the Secretary "contain[ing] 16 listed features," including the requirement for the states to use "reasonable efforts" to maintain children in their own homes. *Id.* at ——, 112 S.Ct. at 1367. But the "reasonable efforts" feature itself "impose[s] only a rather generalized duty on the State," a duty not specific enough to qualify as a privately enforceable right. *Id.* at ——, 112 S.Ct. at 1370.

Significantly, as has been repeatedly recognized in the case law, *Suter* neither overruled *Wilder* nor replaced the *Wilder/Golden State* framework with a different one. *See, e.g., Stowell v. Ives*, 976 F.2d 65, 68 (1st Cir.1992). Yet in arguing that the only right enforceable by plaintiffs under § 1983 is to a state plan approved by the Secretary, defendants suggest an application of *Suter* which is at odds with the holding of *Wilder*.[24] Admittedly, when read alone, *Suter* can be interpreted as holding that when a statute

---

24. In arguing that the provisions sought to be enforced require nothing more from the State than the submission of a State plan, defendants fail to analyze why this is so in terms of the specific language of each provision. But *Suter* requires just this sort of analysis. Further, by lumping all of the statutory conditions together, defendants appear to suggest that the entire Medicaid Act merely requires states to submit a plan. Defs.' Reply in Mot. to Dismiss at 4. Defendants acknowledge, however, that *Suter* is not "so sweeping" as to make unenforceable every provision of the Medicaid Act. *Id.* at 2.

25. The *Wilder* Court rejected this view, in part, based on consideration of regulations which allow the Secretary to withhold federal funds whenever the state plan does not comply *and* whenever there is "noncompliance in practice." *Id.* These regulations, set forth at 42 C.F.R. § 430.35, apply to all plan requirements in § 1396a. *See* 42 C.F.R. § 403.35(a)(1).

26. In attempting to reconcile *Wilder* and *Suter*, the Seventh Circuit characterizes *Wilder* as holding "simply that health care providers could sue to enforce their right to a state plan that did not violate the Boren Amendment; it did not hold that providers had a right to challenge any deviation the state might make from a plan that did comply with federal law." *Clifton v. Schafer*, 969 F.2d 278, 285 (7th Cir.1992). *Clifton* is rather grudgingly followed in another Seventh Circuit opinion, *Procopio v. Johnson*, 994 F.2d

requires submission of a state plan in order to obtain federal funds, a plaintiff has no cause of action under § 1983 beyond an action to require the submission of a conforming plan. *See Suter,* —— U.S. at ——, 112 S.Ct. at 1367 (noting that "the Act does place a requirement on the States, but that requirement only goes so far as to ensure that the State have a plan"); *see also Evelyn V.,* 819 F.Supp. at 193 n. 8 (referring to proposed legislation to reverse *Suter* to the extent it holds that the only enforceable requirement of a federal funding statute is for a state to adopt an approved plan). But such an interpretation would directly conflict with the holding in *Wilder* and with *Wilder*'s express rejection of the view that in the context of the Medicaid statute "the only right enforceable under section 1983 is the right to compel compliance with [ ] bare procedural requirements" such as the adoption of an approved plan. *Wilder,* 496 U.S. at 513, 110 S.Ct. at 2519.[25] Until further guidance is forthcoming, *Suter* and *Wilder* must be reconciled on some other basis than that *Suter* silently overrules *Wilder*.[26] *See, e.g.,*

---

325, 332 (7th Cir.1993) ("For better or for worse, then, under the authority of this circuit, *Artist M.* precludes the [plaintiffs'] federal statutory claim.").

As the *Procopio* court recognizes, *Clifton* is somewhat difficult to reconcile with certain aspects of *Suter*. In particular, *Suter* distinguished *Wilder* not on the basis that the *Wilder* plaintiffs were asserting their right to a conforming state plan, but instead on the basis that the particular plan requirement sought to be enforced in *Wilder* was detailed and specific. *See Procopio,* 994 F.2d at 331 n. 11. Because of this specificity, the statute at issue in *Wilder* imposed more than a requirement for a plan; it imposed substantive requirements on the State:

> In *Wilder*, the underlying Medicaid legislation similarly required participating states to submit to the Secretary … a plan for medical assistance describing the State's Medicaid program. But in that case we held that the Boren Amendment *actually required the States to adopt reasonable and adequate rates,* and that this obligation was enforceable by the providers. We relied in part on the fact that the statute and regulations set forth in some detail the factors to be considered in determining the methods for calculating rates.

*Suter,* —— U.S. at ——, 112 S.Ct. at 1308 (emphasis added). In light of this passage from *Suter, Clifton* loses its persuasive force. *Clifton* has recently been further called into question within

*Arkansas Medical Soc'y, Inc. v. Reynolds,* 6 F.3d 519, 525 (8th Cir.1993); *Stowell,* 976 F.2d at 68, 71; *Travelers Health Network of Louisiana v. Orleans Parish Sch. Bd.,* 842 F.Supp. 236, 240 (E.D.La.1994); *Evelyn V.,* 819 F.Supp. at 194.

■ When *Suter* and *Wilder* are read together, an amalgamated approach can be stated which is consistent with either decision. First, because they have not been repudiated, *Golden State* and *Wilder* still provide the basic framework in deciding whether an enforceable federal right exists under § 1983. Thus, the provision sought to be enforced must be "intended to benefit the putative plaintiff," must be mandatory rather than hortatory, and must not be so vague as to be "beyond the competence of the judiciary to enforce." *Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517. This test should now be applied in light of *Suter*'s directive to focus on "exactly what is required of States" by the statute or statutory section sought to be enforced. *See Evelyn V.,* 819 F.Supp. at 194. Moreover, in determining the precision and assertiveness of the statutory language, *Suter* suggests that it is appropriate to consider: (1) the language in the context of "the entire legislative enactment," *Suter,* ―― U.S. at ――, 112 S.Ct. at 1367; (2) the existence of regulations which provide guidance to the states concerning the method or manner of compliance, *id.* at ――, 112 S.Ct. at 1368; (3) whether the statutory directive is one "whose meaning will obviously vary with the circum-

stances of each individual case," *id.;* (4) the availability of other mechanisms to enforce the statute, *id.;* and (5) the applicable legislative history, *id.* at ――, 112 S.Ct. at 1369.

Each of the six provisions of the Medicaid Act plaintiffs seek to enforce must be individually examined in light of the above approach to determine if a cause of action exists under § 1983.

### III. *Violations of the Medicaid Act and Regulations*

#### A. *In Effect Statewide*

Plaintiffs claim that the State's scheme for providing Medi–Cal methadone maintenance treatment violates the requirement for statewide applicability of Medicaid plans set forth in 42 U.S.C. § 1396a(a)(1): "A State plan for medical assistance must ... provide that it shall be in effect in all political subdivisions of the State, and if administered by them, be mandatory upon them."

■ 1. *Jurisdiction.* Section 1396a(a)(1) creates a federal right enforceable by plaintiffs under § 1983. To begin with, the section is intended to benefit plaintiffs. While it makes no direct reference to Medicaid recipients, recipients of medical services are the obvious beneficiaries of a requirement that a medical assistance plan be in effect statewide. Further, that recipients are the intended beneficiaries is evident in the regulation implementing the section, found at 42 C.F.R. § 431.50.[27] Because the regulation

---

the Seventh Circuit by *Miller v. Whitburn,* 10 F.3d 1315, 1319 (7th Cir.1993) (holding that plaintiff could enforce Medicaid Act sections concerning early and periodic screening, diagnostic, and treatment services ("EPSDT"); distinguishing *Clifton* on ground that the provisions at issue in *Miller* set forth in some detail the services for which a Medicaid-participating state must provide payment in order to discharge its EPSDT obligations).

The First Circuit's statement in *Stowell,* 976 F.2d at 70, that it is adopting a "substantially identical view of the *Wilder/Suter* interface" as the *Clifton* court is dictum. *Stowell* concerned the enforceability of 42 U.S.C. § 1396a(c)(1) which, by its terms, imposes an obligation exclusively upon federal officials. *Stowell,* 976 F.2d at 70; *see also Audette v. Sullivan,* 19 F.3d 254, 256–57 (6th Cir.1994) (following *Stowell*). Hence, *Stowell* is quite different from the circumstances here, in which plaintiffs seek to enforce provisions directed to the states. Moreover, the

First Circuit held, subsequent to *Stowell,* that two sections of the AFDC statute provide enforceable rights under § 1983 because they place mandatory obligations on states, not just on federal officials. *Albiston v. Maine Comm'r of Human Serv.,* 7 F.3d 258, 264–67 (1st Cir.1993).

**27.** The regulations addressing statewide operation of the plan provide:

(b) *State plan requirements.* A State plan must provide that the following requirements are met:

(1) The plan will be in operation statewide through a system of local offices, under equitable standards for assistance and administration that are mandatory throughout the state.

⋅ ⋅ ⋅ ⋅ ⋅

(3) The agency will ensure that the plan is continuously in operation in all local offices or agencies through—

addresses "equitable standards of assistance" and "furnish[ing of] service," its purpose is to ensure that Medi–Cal patients receive statewide access to services.[28] *See* Part III.A.2 *infra.*

Moreover, the section's command to the states is mandatory, specific, and detailed. The statute requires that a state plan "must provide" for statewide application. The *Suter* Court found that nearly identical statutory language in the Adoption Act imposed mandatory standards on the states. *Suter,* —— U.S. at ——, 112 S.Ct. at 1367. The Court interpreted the language to require that "the plan apply to all political subdivisions of the State." [29] *Id.* at ——, 112 S.Ct. at 1368. Further, the regulations define how service is to be furnished in order to achieve statewide operation and outline specific requirements, such as a system of local offices, procedures for equitable and uniform administration of policies, and systematic state evaluations. 42 C.F.R. §§ 431.50(b) & 431.50(c). Given this level of guidance, the statewide requirement is within the competence of the judiciary to enforce.

Finally, while the Medicaid Act gives the Secretary the authority to withhold federal funds from states failing to comply with 42 U.S.C. § 1396a(a), this alternative method of enforcement does not bar a § 1983 action. *See Wilder,* 496 U.S. at 512, 110 S.Ct. at 2519 (citing 42 U.S.C. § 1396c; 42 C.F.R. § 430.-

35). This is true not only for the statewide requirement, but for all the plan provisions plaintiffs seek to enforce. In this respect, the Medicaid Act is distinguishable from the statute at issue in *Suter.* The Adoption Act not only called for loss of federal funds upon submission of a non-compliant plan, but also required an independent judicial determination before the states could be reimbursed for services associated with removing a child from his or her home. *Suter,* —— U.S. at ——, 112 S.Ct. at 1368. A similar additional enforcement mechanism is not available here.[30] Accordingly, plaintiffs may bring suit under § 1983 to enforce the statewide requirement.

■ 2. *Merits.* The parties contest the substance of the statewide requirement. Plaintiffs claim that the section entitles them to statewide access to Medi–Cal funded methadone maintenance *services.* Defendants argue, citing regulations at 42 C.F.R. § 431.-50(b), that § 1396a(a)(1) only requires states to provide statewide access to offices for eligibility determinations and other administrative processes. Defs.' Opp'n to first Summ.J.Mot. at 8. Defendants' argument, however, is misplaced in light of subsection (c) of the regulations. That subsection, by clarifying that not every individual provider must furnish services statewide, indicates that the furnishing of services is indeed encompassed within the requirement of "state-

---

(i) Methods for informing staff of State policies, standards, procedures, and instructions; (ii) Systematic planned examination and evaluation of operations in local offices ...; and (iii) Reports, controls or other methods.
(c) *Exceptions.* (1) "Statewide operation" does not mean, for example, that every source of service must furnish the service State-wide. The requirement does not preclude the agency from contracting with a comprehensive health care organization ... that serves a specific area of the State, to furnish services to Medicaid recipients who live in that area and cho[o]se to receive services from that [organization]. Recipients who live in other parts of the State may receive their services from other sources.
42 C.F.R. § 431.50.

**28.** The parties have not briefed whether the provider plaintiffs are intended beneficiaries of the statewide provision. Because § 1396a(a)(1) is enforceable by the recipient plaintiffs, it is un-

necessary to reach this question. Should the issue become relevant later in the case, additional briefing may be required.

**29.** The Court rejected the *Suter* plaintiffs' argument that the requirement that a plan be "in effect" statewide indicated Congress' intent that each of the 58 plan requirements included in the Medicaid statute imposes a substantive, enforceable obligation on the states. *Suter,* —— U.S. at ——, 112 S.Ct. at 1368. Plaintiffs here, however, seek to enforce the statewide requirement itself, not to use the provision to bolster the argument that a cause of action exists to enforce other sections.

**30.** The efficacy of the Secretary's power to withhold funds is subject to question given that the Secretary no longer requires the State to submit for review the interagency agreement between the Department of Health Services and the Department of Alcohol and Drug Programs. *See* Decl. of James C. Cicconetti, ¶ 5.

wide operation" of the plan. *See Clark v. Kizer,* 758 F.Supp. 572, 580 (E.D.Cal.1990) (the "plain meaning of 'be in effect' would appear to be that the [Medi–Cal dental care] program shall be in existence, operational and functioning"), *aff'd in part and vacated in part on other grounds sub nom., Clark v. Coye,* 967 F.2d 585 (9th Cir.1992) (table); *Morgan v. Cohen,* 665 F.Supp. 1164, 1178 (E.D.Pa.1987) (the plan must "operate uniformly across the state"); *Christy v. Ibarra,* 826 P.2d 361, 364 (Colo.1991) (statewide requirement is violated where "services are available in some counties and not available in the neighboring counties").

Defendants further argue that the requirement for statewide operation, even if applicable to services, would only be violated if the State plan promised methadone maintenance for all who want or need it.[31] Defs.' Opp'n to first Summ.J.Mot. at 9 (relying on *King v. Sullivan,* 776 F.Supp. 645, 652 (D.R.I.1991) ("The State Plan must promise [the services sought] to Plaintiffs before the State's failure to provide such services can constitute a violation of federal law.")). Defendants claim that California's plan promises only to provide those drug abuse treatment services selected by the counties as appropriate for the community; because residents in every county have access to some services—if not methadone maintenance, then methadone de-

toxification or drug free treatment—defendants argue that the plan applies statewide. This argument fails for a number of reasons.

First, defendants' reliance on *King* is misplaced. *King* does not involve the failure to provide any access to services in some parts of the State, but instead involves the State's failure to provide the particular amount and type of service desired by plaintiffs. In *King,* the plaintiffs did not allege a violation of § 1396a(a)(1). Second, defendants' interpretation goes a long way toward nullifying the statutory language. There is no practical difference between a plan which does not apply statewide and a plan which theoretically applies statewide but permits political subdivisions to decline to provide otherwise covered medical services. To permit states to offer different services in different political subdivisions, as long as the plan itself is procedurally applicable to every county, would result in a plan that is neither "in effect" nor operating on a statewide basis, if those terms have any meaning or purpose. *See Wilder,* 496 U.S. at 513, 110 S.Ct. at 2517 (the right to enforce a plan requirement is not "merely a procedural one"); *see also Christy,* 826 P.2d at 363–64. Third, defendants' contention that a plan which does not require all political subdivisions to participate still may be deemed to apply statewide, so long as those counties which provide no ser-

**31.** What the State plan actually promises is ambiguous. The interagency agreement between the Department of Health Services and the Department of Alcohol and Drug Programs describes the obligation of the latter to provide drug treatment services under Medi–Cal, but does not describe in detail the implementation scheme used in the delivery of services. The agreement dated July 1, 1984, which was approved as a Medicaid plan amendment by the Secretary of Health and Human Services in November 1984, contains two relevant provisions: (1) The Department "shall ensure that [Drug/ Medi–Cal] local drug abuse treatment services are available to eligible Medi–Cal beneficiaries in need of such services"; and (2) the Department "shall assure that each local drug abuse program shall provide, or contract for provision of, the services covered under the terms of this agreement." Attachment D to Defs.' Ex. 1, ¶¶ IVA & IVC. The agreement also refers to the state statutory scheme providing for county coordination of services and county-initiated contracts with providers. Attachment A to Defs.' Ex. 1, at 1.

The interagency agreement is re-executed every year. Defs.' Ex. 2. The most recent version of the agreement in the record, effective through June 30, 1993, still contains the first clause quoted above, but modifies the second one to read: The Department "shall assure that each local substance abuse program *which participates in the [Drug/Medi–Cal] program* shall provide, or contract for the provision of, the services covered under the term [sic] of this agreement." Attachment B to Defs.' Ex. 1, ¶ IVC (emphasis added). It is unclear whether this latest version has been "approved" by the Secretary. *See* Defs.' Ex. 2.

Whatever the requirements of the written plan, the parties do not dispute that the State's practice is to give the counties (with the exception of Alameda County) discretion whether and how much to fund Medi–Cal methadone maintenance treatment. Defs.' Statement of Material Facts, ¶ 14. It is this method of implementing the plan, and not the plan itself, that plaintiffs challenge. *See* Pls.' Opp'n to Mot. to Dismiss at 13 n. 3; Pls.' Reply in first Summ.J.Mot. at 1–2.

vices do so according to the plan, is directly contradicted by the regulations. *See* 42 C.F.R. § 431.50(b)(1) ("The plan will be in operation statewide ... under equitable standards for assistance ... that are mandatory throughout the State.").

Finally, methadone maintenance is not distinguishable from other medical services once the State decides to treat it as a covered medical service under Medi–Cal. At oral argument, counsel for defendants suggested that methadone maintenance is analytically distinct from other medical treatment on the basis that drug treatment services contain a "large social component." There may be some force to this argument as a matter of social policy. But there is no basis in the language of the Medicaid Act from which to derive an exception of drug treatment services from the statewide requirement. As a covered service, methadone maintenance is subject to the same requirements as any other medical service. *Weaver v. Reagen,* 886 F.2d 194, 197 (8th Cir.1989). Just as a Medicaid plan which provided residents of some counties access to heart by-pass operations to treat heart disease but residents of other counties access only to nutrition counseling and medication would violate § 1396a(a)(1), so does a plan that provides some residents methadone treatment and others, for example, only "day care habilitative treatment." In short, a state scheme which denies access to a Medi–Cal covered medical treatment or service based on the recipient's county of residence violates the requirement that the plan be in effect statewide.

The remaining question is whether plaintiffs' proof is sufficient to support the requested relief. As evidence that the plan is not in effect statewide, plaintiffs offer, first, the undisputed fact that only 18 counties have elected to receive Medi–Cal funding for methadone maintenance. The Chief Deputy Director of the Department of Alcohol and

Drug Programs states that she believes there may be unmet need in the counties not providing Medi–Cal funded treatment. Dep. of Elizabeth Stanley, 31:14–22. Second, plaintiffs offer the testimony of two Santa Barbara County residents who are on public assistance but who must privately pay for methadone maintenance because that County does not offer Medi–Cal funded treatment. McCloud Decl., ¶ 3; Sanchez Decl., ¶ 3. Finally, the director of the Marin County clinic, which does receive Medi–Cal funds, states that he currently treats a Medi–Cal eligible patient from Lake County who must drive 180 miles each day to obtain treatment. He is unable to place her in a Medi–Cal funded slot because his contract with the County requires him to offer these slots to Marin residents only. Further, at his clinic, approximately 20 Medi–Cal patients are currently paying partial fees for service. Slattery Decl., ¶¶ 7, 8 & 9.

In response, defendants offer evidence which indicates that Drug/Medi–Cal providers in several counties are in fact serving some out-of-county residents. Defs.' Ex. 5, at 3. In addition, most of the 40 counties without Medi–Cal methadone maintenance lack a certified provider, so that treatment is unavailable in those counties even to private-pay patients.[32] Jarfors Decl., ¶ 7. This evidence creates a factual dispute regarding whether Medi–Cal recipients in non-participating counties, as a class, are able to obtain services in other counties within a reasonable distance and a reasonable time.

■ Plaintiffs have made a substantial evidentiary showing that the State scheme limits its Medi–Cal coverage based on county of residence, and thereby have established a likelihood of success on the claim that access to services is unavailable statewide. Some questions remain, however, about the extent of the problem. The record does not reveal whether substantial numbers of the Medi–Cal eligible are unable to obtain service un-

---

32. At oral argument, plaintiffs stated that they do not seek greater access to methadone maintenance treatment than that enjoyed by private-pay patients in the geographic area, but merely comparable access. Under other provisions of the Medicaid Act, the State would not be required to provide greater access to the service by, for ex-

ample, providing sufficient payments to providers to ensure that a methadone clinic exists in every county. 42 U.S.C. § 1396a(a)(30). However, a state may be required to provide transportation services to and from providers. 42 C.F.R. § 431.53.

der the current system, or instead whether only a handful of patients have slipped through the cracks. The lack of such evidence leaves the record insufficiently developed to grant summary judgment as to plaintiffs' claim. *See Irvin v. Griffin Corp.*, 808 F.2d 802, 807 (11th Cir.1987) (district court has wide discretion to deny a summary judgment motion).

However, the current record is sufficiently developed for the court to grant a preliminary injunction on the basis that the State plan is not "in effect" statewide.[33] Plaintiffs' declarations establish that the current system for providing methadone maintenance creates a serious and immediate threat to the health and well-being of some recipients. *See, e.g.*, Quilling Decl.; Randall Decl.; Randolph Decl. Although the State has a legitimate interest in the continuity of its program, the administrative disruption required to provide interim relief to plaintiffs need not be any more substantial than that which occurred when the State intervened in Alameda County. *See* note 7, *supra.* While assuring that the State or all counties cover methadone maintenance services on a statewide basis will undoubtedly take some effort to implement, the plaintiffs are faced with serious and irreparable hardship, including serious health problems. On balance, the hardship suffered by plaintiffs outweighs the State's interest in the continuity of its existing local option treatment system. *Cf. Withrow v. Concannon*, 942 F.2d 1385, 1387–88 (9th Cir.1991); *Bracco v. Lackner*, 462 F.Supp. 436, 452 (N.D.Cal.1978); *Goldberg v. Kelly*, 397 U.S. 254, 266, 90 S.Ct. 1011, 1019, 25 L.Ed.2d 287 (1970). Accordingly, plaintiffs are entitled to a preliminary injunction requiring that Medi–Cal funded methadone maintenance services must be made available to all residents of the State without regard to county of residence.

**B. *Equal Access***

■ Under 42 U.S.C. § 1396a(a)(30), commonly called the "equal access" provision, a state Medi–Cal plan must

> provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to ... assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30). The corresponding regulation provides that "the agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population." 42 C.F.R. § 447.204.

*1. Jurisdiction.* In its recent opinion in *Arkansas Medical Soc'y, Inc. v. Reynolds*, 6 F.3d 519 (8th Cir.1993), the Eighth Circuit held that the equal access provision may be enforced by Medicaid providers and recipients in a § 1983 action. After applying the relevant factors from *Suter* and *Wilder*, the court determined that the provision is "indisputably intended to benefit [ ] recipients" as well as providers. *Id.* at 526. Further, the statutory language, viewed in light of the entire legislative enactment and the legislative history, is expressed in mandatory rather than precatory terms. *Id.* Although some terms in the statute are ambiguous, applicable regulations[34] and the legislative history supply sufficient guidance to the states concerning compliance, and also supply the judicially manageable standards needed to evaluate that compliance. *Id.* at 527. The court concluded that the equal access provision unambiguously confers a

---

**33.** To obtain a preliminary injunction, a party must show either (1) likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor. These are not separate tests, but the "outer reaches of a single continuum." *Los Angeles Memorial Coliseum v. National Football League*, 634 F.2d 1197, 1201 (9th Cir.1980).

**34.** The *Arkansas Medical Soc'y* court referred here to the Department of Health, Education and Welfare Handbook of Public Assistance Administration, Supplement D: *Medical Assistance Programs* (1966–1967) Part 7–5340. *Id.* at 527.

right within the meaning of *Suter*. *Id.* at 527–28. The analysis in *Arkansas Medical Soc'y* is persuasive, and thus the plaintiffs have a § 1983 cause of action to enforce § 1396a(a)(30).

■ 2. *Merits*. Plaintiffs claim that the State is violating the equal access provision in two ways. First, defendants' "method of paying" for methadone maintenance allows a county to eliminate the service from its array of drug treatment programs. As a result, the State's payments are zero in the counties which choose to forego Medi–Cal funding even though private-pay methadone maintenance services are available in some of these counties. Second, the State's "administration" of Medi–Cal methadone maintenance results in "gross disparities" between services available to private-pay patients and services available to the Medi–Cal eligible in counties which do opt to provide the service. Pls.' Supp. in first Summ.J.Mot. at 28. This disparity results from funding constraints which translate to a limited number of Medi–Cal treatment slots.

Plaintiffs seek to give the equal access provision too broad a scope. The conduct of which they complain—the denial of all services in some counties and the limitation on slots in others—may violate other provisions of the Medicaid Act, but it is not prohibited by a provision that concerns only the rate of reimbursement.

The statute and its corresponding regulation prohibit "payments" which result in disparities in service. It is evident from this language and the legislative history that the equal access provision is directed at prohibiting the payment of insufficient reimbursement rates to providers. In 1989, Congress codified the equal access statute, which previously had been contained only in a regulation. The House Report indicates that in this section Congress was concerned only with the rates paid for services supplied by existing providers:

> Under current law, states have discretion in establishing *payment rates* ... for physician services under their Medicaid programs.... A physician's decision to accept Medicaid patients is affected by many factors ... [including] the payment rate

itself.... As [stated in testimony before Congress], 'There is no doubt that *Medicaid reimbursement rates have not kept pace with average community rates.*' ... States have restrained physician fees [to control] program costs.... [T]he Committee believes that, without adequate payment levels, it is simply unrealistic to expect physicians to participate in the program....

> The Committee bill would codify ... the current regulation, 42 C.F.R. § 447.204, *requiring adequate payment levels....* [T]he Medicaid payments would have to be *at a level* that ensures that Medicaid beneficiaries in that area have at least the same access to physicians as the rest of the insured population in that area. The Committee bill would not require that *Medicaid payment levels be high enough* to induce physicians to relocate into this area.

H.R.Rep. 247, 101st Cong., 1st Sess. (1989), *reprinted in* 1989 U.S.C.C.A.N. 1906, 2060, 2115–16 (emphasis added).

Plaintiffs do not cite, and the court has not found, any authority holding the equal access provision applicable to disputes challenging the distribution of services independently of the reimbursement rate paid. *Cf. Arkansas Medical Soc'y*, 6 F.3d at 519 (challenge to 20 percent across the board cut in reimbursement rates); *Clark v. Kizer*, 758 F.Supp. 572, 578 (E.D.Cal.1990) (noting that "the statute directs the State's attention to reimbursement levels"; reimbursing dentists at 40 percent of their usual rates violates the equal access requirement), *aff'd in part and vacated in part on other grounds sub nom., Clark v. Coye*, 967 F.2d 585 (9th Cir.1992) (table); *King v. Sullivan*, 776 F.Supp. 645, 654–55 (D.R.I.1991) (equal access challenge rejected when the gist of plaintiffs' complaint was a shortage of a particular type of Medicaid service).

The equal access provision is directed at a particular problem—inadequate reimbursement rates—and the court declines to expand it to encompass plaintiffs' claims regarding the inadequate amount and distribution of services available. The provision and distribution of services is specifically addressed in

other sections of the Medicaid Act, including §§ 1396a(a)(1), 1396a(a)(8), and 1396a(a)(10)(B), and these sections must govern the resolution of plaintiffs' claim. Because Medi–Cal reimbursement rates for methadone maintenance treatment compare favorably to the rates paid by private-pay patients, *see* Decl. of Allan F. Harlow, ¶ 7,[35] plaintiffs have failed to raise serious questions going to the merits of their claim that the State has violated the equal access provision. Summary judgment is not appropriate for plaintiffs for the same reason.

## C. *Comparability for Categorically Needy Individuals*

■ 42 U.S.C. § 1396a(a)(10)(B) creates an equality principle by which all categorically needy individuals must receive medical assistance which is no less than that provided to any other categorically or medically needy individual.[36]

1. *Jurisdiction.* Section 1396a(a)(10)(B) creates a federal right that can be enforced under § 1983 by those plaintiffs who are categorically needy within the meaning of 42 U.S.C. § 1396a(a)(10)(A). First, the comparability requirements contained in § 1396a(a)(10)(B) are intended to benefit the categorically needy plaintiffs in this case. The statute addresses the benefits to be received by "any [categorically needy] *individual*" in relation to benefits received by other categorically needy individuals or by medically· needy individuals. 42 U.S.C. § 1396a(a)(10)(B) (emphasis added). Similarly, the implementing regulation refers to "services available to any *individual*" or "any categorically needy *recipient.*" 42 C.F.R. § 440.240 (emphasis added).[37] Thus, the language of § 1396a(a)(10)(B) and 42 C.F.R. § 440.240 indicates that the Act's comparability provision is designed to benefit individuals who are categorically needy, such as plaintiffs.

Second, like the other sections of the Act at issue in this case, § 1396a(a)(10)(B) is phrased in mandatory, not precatory, terms. The statute provides that a state plan for medical assistance "*must* ... provide ... that the medical assistance made to any [categorically needy] individual ... *shall* not be less in amount, duration, or scope than the medical assistance made available" to any other categorically needy individual or to medically needy individuals. 42 U.S.C. § 1396a(a)(10)(B) (emphasis added).

Third, the statute is sufficiently precise to be within the competence of the judiciary to enforce. Section 1396a(a)(10)(B) requires the states to provide all individuals who are categorically needy with medical assistance at least as extensive, in terms of "amount, duration, or scope," as that provided to the medically needy or to any other categorically needy person. These directions provide courts with an objective "benchmark," *see Wilder,* 496 U.S. at 519, 110 S.Ct. at 2523, against which to measure a state's performance. Because the statutory and regulatory scheme "presents a straightforward, identifiable standard ... readily susceptible of judicial evaluation," *Albiston v. Maine Comm'r of Human Serv.,* 7 F.3d 258, 267 (1st Cir.1993), the court has jurisdiction over a claim brought under § 1983 to enforce § 1396a(a)(10)(B).

35. Although the information provided in this declaration is less than straightforward, plaintiffs do not dispute defendants' claim that Medi–Cal reimbursement rates are comparable to private fees.

36. A State plan for medical assistance must ... provide ... that the medical assistance made available to any [categorically needy] individual ...—
    (i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and
    (ii) shall not be less in amount, duration, or scope than the medical assistance made available to [medically needy] individuals.
42 U.S.C. § 1396a(a)(10)(B).

*See* note 4 *supra* for the definition of categorically and medically needy.

37. 42 C.F.R. § 440.240 provides, in relevant part, that:
    (a) The [state] plan must provide that the services available to any categorically needy recipient under the plan are not less in amount, duration, and scope than those services available to a medically needy recipient; and
    (b) The plan must provide that the services available to any individual in the following groups are equal in amount, duration, and scope for all recipients within the group:
    (1) The categorically needy.
    (2) A covered medically needy group.

**1140**

■ 2. *Merits.* The plain language of § 1396a(a)(10)(B) requires that a state plan for medical assistance must provide that each categorically needy individual receive medical assistance not less in amount, duration, and scope than that received by other categorically needy persons or by medically needy persons in the state. It is undisputed that the Drug/Medi–Cal program fails to fund enough methadone maintenance slots for all of the categorically needy who are eligible for the service. By denying the same service to the categorically needy members of the plaintiff class that is received by other categorically needy persons and by some medically needy persons, the State violates § 1396a(a)(10)(B). Plaintiffs are entitled to summary judgment on this claim.[38]

Defendants make two principal arguments in an attempt to avoid this conclusion. First, they claim that § 1396a(a)(10)(B) is designed to ensure comparability *between* the various groups that comprise the categorically needy, not to ensure comparability *within* each such group.[39] Second, defendants argue that even if the Medicaid Act requires comparability within the different groups of the categorically needy, comparability only extends to the "amount, duration, and scope" of medical as-

---

**38.** Defendants argue that the record is not sufficiently developed for summary judgment on this claim. It may be that some methadone maintenance providers have not maintained records pertaining to waiting lists in a very meticulous manner. However, defendants have never disputed plaintiffs' ultimate factual contention—that some plaintiffs are categorically needy and are eligible for methadone maintenance treatment but have been forced either to obtain such treatment privately or to wait for a Medi–Cal funded treatment slot to open.

**39.** Defendants also claim, without citation to any authority, that § 1396a(a)(10)(B)(ii)—the provision which requires that categorically needy individuals receive medical assistance not less in amount, duration, or scope than that made available to medically needy individuals—is only intended to prevent discrimination against the categorically needy as a group as opposed to individual instances of unequal treatment. Defendants' argument is belied by 42 C.F.R. § 440.240(a), which requires that a "plan must provide that the services available to *any* categorically needy *recipient* under the plan are not less in amount, duration, and scope than those services available to a medically needy *recipient*." 42

---

sistance, which is not implicated when providers are forced by State budgetary shortfalls to place some, but not all, categorically needy persons on waiting lists for Medi–Cal funded treatment slots. Neither of these arguments is persuasive.

### a. Comparability Within Groups of the Categorically Needy.

Defendants claim that § 1396a(a)(10)(B) seeks to ensure comparable services for the distinct groups that make up the categorically needy, not parity for individuals within those distinct groups. Defendants cite *Schweiker v. Hogan,* 457 U.S. 569, 573 n. 6, 102 S.Ct. 2597, 2601 n. 6, 73 L.Ed.2d 227 (1982), which notes that the legislative history of the section refers to the need to "eliminate some of the unevenness which has been apparent in the treatment of the medical needs of various *groups* of the needy." *Id.* (quoting H.R.Rep. No. 213, 89th Cong., 1st Sess. 66 (1965)) (emphasis added). Defendants also rely on the initial language of § 1396a(a)(10)(B), prior to its amendment in 1973, which seemingly required comparability between groups of the categorically needy.[40]

The present language of the statute, however, expressly requires that any categorical-

---

C.F.R. § 440.240(a) (emphasis added). This regulation is a permissible construction of § 1396a(a)(10)(B) by the agency charged with responsibility for enforcing the Medicaid Act and is due great deference. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 434, 91 S.Ct. 849, 855; 28 L.Ed.2d 158 (1971).

**40.** The first version of § 1396a(a)(10)(B) was added to the Social Security Act in the Social Security Act Amendments of 1965. It provided, in relevant part:

Sec. 1902. (a) A State plan for medical assistance must— ...
(10) provide for making medical assistance available to all individuals receiving aid or assistance under State plans approved under titles I, IV, X, XIV, and XVI; and—
(A) provide that the medical assistance under any such State plan—
(i) shall not be less in amount, duration, or scope *than the medical assistance made available to individuals receiving aid or assistance under any other such State plan,* and
(ii) shall not be less in amount, duration, or scope than the medical or remedial care and services made available to individuals not re-

ly needy individual receive medical assistance not less in amount, duration, and scope than that received by "any other such individual." 42 U.S.C. § 1396a(a)(10)(B)(i). Given "the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written," *Estate of Cowart v. Nicklos Drilling Co.,* —— U.S. ——, ——, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992), defendants' argument must be rejected.[41] All relevant reported cases and scholarly authority examining § 1396a(a)(10)(B) support this conclusion. *See, e.g., White v. Beal,* 555 F.2d 1146, 1149 (3d Cir.1977) ("[A]ll persons within a given category must be treated equally."); *Becker v. Toia,* 439 F.Supp. 324, 333 (S.D.N.Y.1977) (noting that under the comparability provisions of the Act, each categorically needy person "shall be eligible for the same 'amount, duration and scope' of coverage as all the others in his or her group"); *Roe v. Casey,* 464 F.Supp. 487, 494 (E.D.Pa. 1978) ("[T]he medical assistance made available to either a categorically needy or medically needy person shall not be less in amount, duration or scope than the medical assistance made available to any other person in that particular category."), *aff'd,* 623 F.2d 829 (3d Cir.1980); Schultz & Parmenter, *Medical Necessity, AIDS, and the Law,* 9 St. Louis U.Pub.L.Rev. 379 (1990) ("The equitable distribution requirement mandates that the medical assistance provided to any individual within a given group of . . . categorically needy 'shall not be less in amount, duration, or scope than the medical assis-

tance made available to any other such individual. . . .") (quoting 42 U.S.C. § 1396a(a)(10)(B)).

*Mississippi v. Sullivan,* 951 F.2d 80 (5th Cir.1992), is not to the contrary. In *Sullivan,* the court interpreted 42 U.S.C. § 1396a(a)(17)[42] to require comparability between and not within groups of the categorically needy with respect to the standards used to determine eligibility for medical assistance. However, § 1396a(a)(17) explicitly requires that standards be "comparable for all groups [of the categorically needy]," while § 1396a(a)(10)(B) refers to comparable treatment for categorically needy "individuals." Congress' use of different language in §§ 1396a(a)(10)(B) and 1396a(a)(17) suggests that Congress intended a different standard in the two sections, and provided for comparability between groups in § 1396a(a)(17) but within groups in § 1396a(a)(10)(B). *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir. 1972) (alteration in original)).[43]

b. *Medical Assistance Less in Amount, Duration, or Scope.*

Defendants argue that placement of plaintiffs on waiting lists is not the same as

ceiving aid or assistance under any such plan
. . .

Social Security Act Amendments of 1965, § 121 (emphasis added), *reprinted in* Stevens, *supra* note 3, at 765–66.

**41.** Although the legislative history of predecessor bills may be relevant to discerning the legislative intent of a later enactment, *see Estate of Cowart,* —— U.S. at ——, 112 S.Ct. at 2595, an inquiry into such legislative history ordinarily is not necessary when the language of the later enactment is clear. *See Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984) ("[W]e look first to the statutory language and then to the legislative history if the statutory language is unclear."); *Estate of Cowart,* —— U.S. at ——, 112 S.Ct. at 2594 ("[W]hen a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished.").

**42.** 42 U.S.C. § 1396a(a)(17) provides, in relevant part, that a "State plan for medical assistance must . . . include reasonable standards (which shall be comparable for all groups [of the categorically needy] . . .) for determining eligibility for and the extent of medical assistance under the plan."

**43.** *Greenstein v. Bane,* 833 F.Supp. 1054 (S.D.N.Y.1993), also fails to support defendants' position. In *Greenstein,* the court held that the State of New York violated § 1396a(a)(10)(B) by failing to fully reimburse categorically needy persons who had incurred out-of-pocket expenses for authorized Medicaid services due to agency error and delay. *See id.* at 1061, 1073–74. There is no indication that the plaintiffs in *Greenstein* belonged to one particular categorically needy group and that the members of other categorically needy groups were not experiencing the same problems as the plaintiffs.

**1142**

providing them with medical assistance that is less in "amount, duration, or scope" than that received by others through Medi–Cal. They claim that waiting lists have nothing to do with amount, duration, or scope of medical assistance: Since all eligible recipients eventually will receive the same services and reimbursement for such services, § 1396a(a)(10)(B) is satisfied.

The State's argument brings to mind Lord Keynes' rejoinder that "in the long run we are all dead."[44] In the long run all categorically needy persons may receive services. But in the meantime they do not, and life does not stop for them during this interim period. For anyone in immediate need of medical treatment, the value of medical services provided in the future is less than the value of medical services provided when needed, particularly when the need is great.[45] *See Greenstein v. Bane,* 833 F.Supp. 1054, 1074 (S.D.N.Y.1993) (plaintiffs "forced to pay for treatment or services which are furnished to ordinary Medicaid recipients without charge ... have not received assistance equal in amount to the assistance received by these other recipients who pay nothing. As compared with other Medicaid recipients, plaintiffs' medical assistance has diminished in value"); *cf. Clark v. Kizer,* 758 F.Supp. 572, 580 (E.D.Cal.1990) (granting summary judgment to plaintiffs, in part, on ground that varying availability of Denti–Cal (the dental component of California's Medicaid program) violated the comparability requirement of the Medicaid Act), *aff'd in part and vacated in part on other grounds sub nom., Clark v. Coye,* 967 F.2d 585 (9th Cir.1992) (table); *Hodecker v. Blum,* 525 F.Supp. 867, 873 (N.D.N.Y.1981) (holding that State's Medicaid budgetary process, which required

the relatives of adult Medicaid recipients to contribute more than the relatives of minor Medicaid recipients to a patient's care, violated the comparability rule for categorically needy persons), *aff'd,* 685 F.2d 424 (2d Cir. 1982). Thus, the delay of medical services to some of the categorically needy violates the "amount, duration, or scope" requirement of the comparability provision.

A holding that the State violates § 1396a(a)(10)(B) by funding Medi–Cal in such a way as to create waiting lists is not inconsistent with other provisions in the Act[46] and with cases such as *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), which emphasize that states have substantial discretion to choose the proper amount, scope, and duration limitations on coverage. Despite the comparability requirement, the State retains substantial discretion in determining eligibility standards and in choosing the overall mix of optional benefits to include in its plan.[47]

Plaintiffs are entitled to summary judgment on their claim brought under § 1396a(a)(10)(B).

### D. Service Sufficient in Amount, Duration, and Scope

■ Plaintiffs seek relief on their claim that the State, by denying methadone maintenance treatment to some who are Medi–Cal eligible, for reasons other than medical necessity, has violated the regulation found at 42 C.F.R. § 440.230(b): "Each service must be sufficient in amount, duration and scope to reasonably achieve its purpose." Plaintiffs claim, and it appears from a review of the statutes listed in 42 C.F.R. § 440.200 as the source of the regulation, that § 440.230(b)

---

44. *See* Pigou, *John Maynard Keynes, in* 32 Proceedings of the British Academy 407.

45. The evidence in the record establishes that plaintiffs suffer homelessness, exposure to disease, medical complications resulting in hospitalization, and risk probation revocation as a result of not being able to obtain methadone maintenance treatment through Medi–Cal. Thus, methadone maintenance treatment beginning tomorrow has a greater value than does the same treatment beginning in six months, because treatment tomorrow may spare a patient from enduring six months of suffering.

46. In particular, defendants point to 42 U.S.C. § 1396, which provides that federal funds are appropriated under the Medicaid Act "[f]or the purpose of enabling each State, as far as practicable under the conditions in such State," to furnish medical assistance.

47. For example, the State may limit continuing methadone maintenance treatment to those persons who remain drug-free or may eliminate funding for methadone maintenance altogether.

implements § 1396a(a)(10)(B).[48] Yet the regulation—directed to the sufficiency of each medical service to achieve the purpose of the service—has little relation to the comparability requirement contained in the statute.

Whether a regulation, independent of an underlying statute, is enforceable under § 1983 is a matter of some uncertainty. Plaintiffs rely on *Wright v. City of Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), for the proposition that "a federal regulation can create an enforceable right under section 1983." Pls.' Supp. in first Summ.J.Mot. at 22 n. 14. Indeed, some circuits have adopted such an interpretation of the holding in *Wright. See West Virginia Univ. Hosp., Inc. v. Casey,* 885 F.2d 11, 18 (3d Cir.1989) ("[V]alid federal regulations as well as federal statutes may create rights enforceable under section 1983."), *aff'd on other grounds,* 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); *Samuels v. District of Columbia,* 770 F.2d 184, 199 (D.C.Cir.1985) ("[S]ection 1983 provides a legal remedy for the violation of all valid federal laws, including at least those federal regulations adopted pursuant to a clear congressional mandate that have the full force and effect of law."); *see also Ermler v. Town of Brookhaven,* 780 F.Supp. 120, 122 (E.D.N.Y.1992). But *Wright* is susceptible to a more limited interpretation. In holding that public housing tenants could enforce the Brooke Amendment to the Housing Act and its implementing regulations under § 1983, the majority opinion examined the statute and regulation together to determine whether they conferred specific, definable rights on plaintiffs. *See Wright,* 479 U.S. at 429–33, 107 S.Ct. at 773–76. The regulation at issue in *Wright* defined a term used in the statute itself; unlike the regulation here, it neither stood alone nor was analyzed independently of its statutory mooring. *Id.* at 420, 107 S.Ct. at

768–69.[49] Only the dissent raised the question "whether administrative regulations *alone* could create [an enforceable] right." *Id.* at 437, 107 S.Ct. at 777 (O'Connor, J., dissenting); *see also id.* ("This is a troubling issue not briefed by the parties, and I do not attempt to resolve it here."). In the Ninth Circuit, whether a regulation standing alone may create enforceable rights is apparently an open question. *See Howard v. City of Burlingame,* 937 F.2d 1376, 1380 (9th Cir. 1991) (noting that "federal regulations ... may define legal obligations enforceable under section 1983"; "[t]here is some question, however, whether they may create rights not already implied by the enabling statute"). Although plaintiffs cite several cases where courts have decided the merits of § 440.-230(b) claims standing alone, not one of these cases addresses the jurisdictional issue. *See, e.g., Weaver v. Reagen,* 886 F.2d 194, 198 (8th Cir.1989); *White v. Beal,* 555 F.2d 1146, 1151 (3d Cir.1977); *King v. Sullivan,* 776 F.Supp. 645, 653 (D.R.I.1991); *Linton v. Carney,* 779 F.Supp. 925, 936 (E.D.Tenn. 1990); *Ledet v. Fischer,* 638 F.Supp. 1288, 1293 (M.D.La.1986); *Allen v. Mansour,* 681 F.Supp. 1232, 1237 (E.D.Mich.1986).

Even assuming the "amount, duration and scope" regulation may be enforced independently of any statutory section that generally confers the same right, it is unclear that the regulation is framed with the requisite specificity to create an enforceable right under *Suter.* The regulation provides that each Medicaid service must be "sufficient ... to reasonably achieve its purpose." What is considered reasonable, however, is not defined. The precise definition would seem to "vary with the circumstances of each individual case," a characteristic which, under *Suter,* is not associated with an enforceable right under § 1983. *Suter,* —— U.S. at ——, 112 S.Ct. at 1368. Although *Wilder* and

---

48. However, this conclusion is not obvious from the regulation itself, and the uncertainty is enhanced by the existence of § 440.240 of the regulations. Section 440.240 paraphrases the requirements of § 1396a(a)(10)(B) and thus, unlike § 440.230, clearly derives from the statute.

49. In *Oklahoma Nursing Home Ass'n v. Demps,* 792 F.Supp. 721, 726 (W.D.Okla.1992), the court rejected the very narrow view that the Court in

*Wright* used the regulation only to help define a statutory term. However, "*Wright* does not support the broad proposition that federal agency regulations, standing alone, may create rights enforceable under section 1983." *Id.* Instead, "it supports the proposition that courts may look to administrative regulations to define the scope of rights created by statute." *Id.*

*Suter* look to guidance from statutory language, regulations, and legislative history to provide the necessary specificity, plaintiffs here offer only judicial interpretations to clarify the section.

In *King,* the court provides one interpretation:

> When a state commits itself to providing Medicaid services, 42 C.F.R. § 440.230(b) simply obligates the state to provide them adequately, so that the state does not nominally recognize its obligations while failing to meet them financially. And the state need not meet its obligations perfectly. A service is sufficient in amount, duration and scope if it adequately meets the needs of most individuals eligible for Medicaid....

776 F.Supp. at 652 (citing *Charleston Memorial Hosp. v. Conrad,* 693 F.2d 324, 330 (4th Cir.1982)). *Accord Curtis v. Taylor,* 625 F.2d 645, 653 (5th Cir.1980); *see also Virginia Hosp. Ass'n v. Kenley,* 427 F.Supp. 781, 786 (E.D.Va.1977) (construing an apparently earlier version of the regulation). In another line of cases, however, the courts have taken a different approach, holding a decision to deny services arbitrary and unreasonable under § 440.230(b) when it is made for reasons other than medical necessity. *See Weaver,* 886 F.2d at 198; *White,* 555 F.2d at 1151; *Allen,* 681 F.Supp. at 1237; *Ledet,* 638 F.Supp. at 1293. Other than these possibly inconsistent judicial interpretations, plaintiffs have directed the court to no other source for assistance in interpreting the origins or purpose of the vague language in the regulation. While more thorough briefing may shed additional light on this question, the court declines to determine whether the regulation creates enforceable rights in plaintiffs on the current state of the briefing. Further, even if the "amount, duration and scope" regulation is enforceable by private actions under § 1983, the scope of the states' obligation under the regulation is unclear in light of the conflicting case law.

**E.** *Single State Agency*

■ A state's Medicaid plan must "provide for the establishment or designation of a single State agency to administer or supervise the administration of the plan." 42 U.S.C. § 1396a(a)(5).[50] Implementing regulations provide, in pertinent part, that to qualify as a Medicaid agency

> (1) the agency must not delegate, to other than its own officials, authority to—
>
> (i) Exercise administrative discretion in the administration or supervision of the plan, or
>
> (ii) Issue policies, rules, and regulations on program matters.
>
> .     .     .     .     .
>
> (3) If other State or local agencies or offices perform services for the Medicaid agency, they must not have the authority to change or disapprove any administrative decision of that agency, or otherwise substitute their judgment for that of the Medicaid agency with respect to the application of policies, rules, and regulations issued by the Medicaid agency.

42 C.F.R. § 431.10(e). Read with the regulation, the requirement of a single state agency is both mandatory in its terms and specific and detailed in its command to the states. Much more doubtful, however, is whether Medicaid recipients and providers are the intended beneficiaries of the single state agency requirement.[51] The court concludes that they are not and thus that the section does not confer upon plaintiffs a right enforceable through § 1983.

The single state agency clause is not phrased in terms of benefitting plaintiffs or providing services to plaintiffs. *Compare Wilder,* 496 U.S. at 510, 110 S.Ct. at 2517–18 (there can be "little doubt" that the Boren Amendment was intended to benefit health care providers since the language is "phrased in terms benefitting [them]" by requiring payment for health care services). Instead,

---

**50.** Section 1396a(a)(5) provides for several exceptions not relevant here.

**51.** Plaintiffs confine their analysis and argument to urging the enforceability of the Medicaid Act by the recipient plaintiffs. Pls.' Supp. in first

Summ.J.Mot. at 23. However, the single state agency requirement is equally unenforceable by the provider plaintiffs, for the same reasons it is unenforceable by recipients.

it is phrased in terms of plan administration by a single agency. This focus is made more emphatic in the implementing regulation which forbids delegations of discretion or rule making authority to other agencies. Both the statute and regulation appear directed to the efficient and uniform operation of the Medicaid program, rather than to the provision of a direct or immediate benefit to Medicaid recipients or providers. Of course, any provision of the Medicaid Act may in some general sense be viewed as benefitting recipients, since this is the purpose of the statute as a whole. But such a generalized intent to benefit recipients is not enough under *Wilder* and *Suter* to confer a § 1983 cause of action. Here neither the statute nor the regulation unambiguously confers a benefit on recipients or providers.

This view of the statutory language is supported by the legislative history of the section. The single state agency requirement first appeared in the original Social Security Act of 1935, and was copied, practically verbatim, into the Medicaid Act in 1965. *See* H.R. 4120, § 204, 74th Cong., 1st Sess. (1935), *reprinted in* Stevens, *supra,* at 100. The 1935 Act was enacted, in part, based on the recommendations and proposals of the President's Committee on Economic Security, established by Executive Order in 1934. Stevens, *supra,* at 64. Documents submitted to the Committee reflect a debate regarding whether the social security program would be best administered solely by the federal government or instead under the system ultimately adopted—a system of federal-state cooperation, with each state administering its own program under federal requirements. *See id.* at 78; *see also Guidice v. Jackson,* 726 F.Supp. 632, 635 (E.D.Va.1989) (quoting Social Security Board, *Social Security in America, A Summary of Staff Reports of the Committee on Economic Security* 161, 191 (1937) ("The Committee recommended that responsibility for administration of the assistance be centralized within the state to 'avoid a diversity of operating standards in the subdivisions within the [s]tate[s].'")), *aff'd,* 915 F.2d 1564 (4th Cir.1990) (table). While many complex considerations were involved, Congress' overriding concern was with developing a successful and workable national so-

cial security program. *See* Stevens, *supra,* at 78.

The legislative history of the 1965 Medicaid Act's single state agency requirement— 42 U.S.C. § 1396a(a)(5)—maintains this concentration on administrative efficiency. Congress adopted the language of the Social Security Act of 1935 without comment and only debated which state agency was to be charged with the administrative responsibility for the program. The House bill provided that the agency responsible for eligibility determinations under the existing Social Security programs should also administer Medicaid. H.R.Rep. No. 213, 89th Cong., 1st Sess. (1965), *reprinted in* 12665–2 *House Miscellaneous Reports on Public Bills II* at 65. The House's purpose was primarily to ensure that beneficiaries received prompt determinations of eligibility, but the House also recognized the importance of involving welfare agencies in the administration of medical care. Consequently, the House version required the eligibility agency to cooperate with other agencies "[i]n order to make certain that there is no duplication of effort and that maximum utilization will be made of the resources available from such other agencies." *Id.*

In the Senate, the bill was changed to allow the states themselves to select the administering agency. S.Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N.1943. This change was precipitated by the Senate's conclusion that the program might be better administered by public health agencies. *Id.* at 2016 (noting that "witnesses ... have expressed the belief that the State health agency should be given the primary responsibility under this program"); *see also* 111 Cong.Rec. 17729 (1965) (statement of Rep. Mills) ("[M]edical programs have to have the advice of ... those people who are skilled in the field of medical services.... Such a program cannot be properly administered in my opinion without their advice and assistance."), *reprinted in* 1965 U.S.C.C.A.N. at 2295. Thus, administrative efficiency appears to have been the overriding purpose of the Senate. The role for the eligibility agency was preserved, but as secondary rather than primary. That the

Senate version was ultimately enacted, *see* Conf.Rep. No. 682, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 2228, 2245, suggests that Congress adopted the Senate's emphasis on administration over the House's concern regarding eligibility determinations. Plaintiffs have cited no contrary legislative history establishing Medicaid recipients as the intended beneficiaries of the single state agency requirement.[52]

Further, the applicable regulation suggests that the purpose of both the regulation and statute is to further the efficient operation of the program and properly allocate authority within the state and between the federal and state governments. *See* 42 C.F.R. § 431.10. Subdivision (e), quoted above, limits the ability of the designated agency to delegate authority. Subdivisions (b) and (c) concern procedures for designation of the single agency and the eligibility agency, if different. Subdivision (d) requires a written agreement allocating responsibility between federal and state agencies. Nothing in the regulations suggests a primary purpose of benefitting recipients. *Cf.* 42 C.F.R. §§ 431.50(c), 435.-930 & 447.204 (regulations implementing other sections of the Medicaid Act directly address the level and type of service to which beneficiaries are entitled). At most, Medicaid recipients and providers are incidental beneficiaries of the single state agency requirement, to the extent that it results in an efficiently operating Medicaid program. This benefit is too remote, however, to confer an unambiguous federal right on plaintiffs to enforce the statute or regulation through a § 1983 cause of action. Accordingly, defen-

dants' motion to dismiss plaintiffs' claim under 42 U.S.C. § 1396a(a)(5) is granted.

### F. *Reasonable Promptness*

■ Plaintiffs allege that the defendants' failure to provide a sufficient number of methadone maintenance treatment slots, which forces Medi–Cal eligible persons onto waiting lists, violates 42 U.S.C. § 1396a(a)(8), the Medicaid Act's "reasonable promptness" provision.

1. *Jurisdiction.* Under 42 U.S.C. § 1396a(a)(8), a state plan for medical assistance "must … provide that all individuals wishing to make application for medical assistance under the plan shall have the opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." Corresponding regulations provide:

> The agency must—
>
> (a) Furnish Medicaid promptly to recipients without any delay caused by the agency's administrative procedures;
>
> (b) Continue to furnish Medicaid regularly to all eligible individuals until they are found to be ineligible. . . .

42 C.F.R. § 435.930.

Because § 1396a(a)(8) establishes requirements for providing services and is "phrased in terms of benefitting" individuals seeking Medicaid services, Medi–Cal recipients are the intended beneficiaries. *See Wilder,* 496 U.S. at 508–10, 110 S.Ct. at 2517. Similarly, the obligation imposed is mandatory because the state plan "must … provide" that medi-

---

**52.** Plaintiffs' reliance on a statement in *Hillburn v. Maher,* 795 F.2d 252 (2d Cir.1986), *cert. denied,* 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 859 (1987), is misplaced. Read carefully, *Hillburn* actually supports the view that the section's purpose is administrative efficiency. *See id.* at 261 (the reason for the single state agency requirement "was to avoid a lack of accountability for the appropriate operation of the program"). While *Hillburn* cites to a legislative history reference suggesting a second purpose of providing services to recipients, a review of that reference (1965 U.S.C.C.A.N. at 2016–17) shows that it construes a different Medicaid plan requirement, 42 U.S.C. § 1396a(a)(19). The legislative history of another section is not particularly persuasive in light of *Suter*'s directive to examine separately each provision sought to be enforced. In the

pre-*Suter* case of *Morgan v. Cohen,* 665 F.Supp. 1164, 1177 (E.D.Pa.1987), the court uncritically relies on *Hillburn*'s legislative history analysis and considers the purpose of *other* provisions of the Medicaid Act in determining that the single state agency requirement could be enforced by recipients.

Similarly, other cases addressing substantive violations of § 1396a(a)(5) do so without analysis of the jurisdictional issue. *See Fulkerson v. Maine Dep't of Human Serv.,* 802 F.Supp. 529, 538 (D.Me.1992); *Linton v. Carney,* 779 F.Supp. 925, 936 (E.D.Tenn.1990); *Forsyth County Bd. of Social Serv. v. Division of Social Serv.,* 346 S.E.2d 414, 417 (N.C.1986). Of these cases, only *Fulkerson* is post-*Suter*. *Fulkerson,* however, does not discuss *Suter* even though *Suter* was decided several months before.

cal assistance "shall be furnished" in accordance with the section.

Moreover, the requirement of "reasonable promptness" is sufficiently definite to enforce. *See Wellington v. District of Columbia,* 851 F.Supp. 1, 5 (D.D.C.1994). A statute is not necessarily too vague to be within the competence of the judiciary to enforce merely because it requires an inquiry into "reasonableness." *Albiston v. Maine Comm'r of Human Serv.,* 7 F.3d 258, 267 (1st Cir.1993). The "relevant question is whether the *action or purpose* whose 'reasonableness' is commanded has been clearly delineated and is susceptible of judicial ascertainment." *Id.* Section 1396a(a)(8) is more analogous to the "reasonable cost" provision in *Wilder* than to the "reasonable efforts" provision in *Suter.* What constitutes "reasonable" promptness in providing medical assistance is inherently more circumscribed and judicially ascertainable than the concept of "reasonable efforts" in the placement of foster children, which requires case by case consideration. *Cf. id.* ("'[P]romptness of payment' presents a straightforward, identifiable standard ... readily susceptible of judicial evaluation."). In addition, the implementing regulations provide standards for compliance. Under 42 C.F.R. § 435.930, administrative procedures may not delay a state's provision of services.[53] And 42 C.F.R. § 435.991 prescribes acceptable time limits for particular administrative procedures such as eligibility determinations, thereby establishing definite standards for measuring acceptable delay in providing services.[54] How the state is to comply is not left to the state itself as in *Suter,* but is instead measured by standards that are within judicial competence to enforce.[55] *See Wellington,* 851 F.Supp. at 5. Accordingly, the reasonable promptness clause confers enforceable rights on plaintiffs.

■ 2. *Merits.* Defendants assert that the reasonable promptness requirement applies only to the application and eligibility process and has no bearing whatsoever on the provision of care and services, not even on administrative delay in the provision of service. However, § 1396a(a)(8) requires "medical assistance under the plan" to be furnished with reasonable promptness, and this can only mean medical services. *See* 42 U.S.C. § 1396d(a). Similarly, the regulation refers to "furnish[ing] Medicaid," not merely processing applications. Defendants' interpretation is also contradicted by the case law. *See McMillan v. McCrimon,* 807 F.Supp. 475, 480 (C.D.Ill.1992) (scope of § 1396a(a)(8) is not limited to the initial provision of a Medicaid card). Because defendants' argument is incompatible with the plain language of § 1396a(a)(8), their motion to dismiss plaintiffs' reasonable promptness claim is denied.

In seeking summary judgment on this claim, plaintiffs argue that the reasonable promptness provision is violated: (1) because

---

53. In holding that the AFDC statute's reasonable promptness provision creates a judicially enforceable right, the First Circuit found that, "to the extent further guidance may be required to demarcate the contours of reasonable 'promptness,'" an AFDC regulation which contains language identical to that of 42 C.F.R. § 435.930 sufficiently did so. *See id.* at 267.

54. That regulation provides, in relevant part:
(a) The agency must establish time standards for determining eligibility and inform the applicant of what they are. These standards may not exceed—
(1) Ninety days for applicants who apply for Medicaid on the basis of disability; and
(2) Forty-five days for all other applicants.

. . . . .

(c) The agency must determine eligibility within the standards except in unusual circumstances. . . .

(d) The agency must document the reasons for delay in the applicant's case record.
(e) The agency must not use the time standards—
(1) As a waiting period before determining eligibility. . . .
42 C.F.R. § 435.911.

55. The absence of more specific standards in the Medicaid regulations as to what other sorts of delays in the delivery of medical assistance, such as those created by waiting lists for treatment, violate the reasonable promptness requirement is not surprising if the court is correct that this section was designed to eliminate precisely those sorts of delays. *See* Part III.E.2. *infra.*

patients in counties which offer Medi–Cal funded methadone treatment are placed on waiting lists for Medi–Cal slots due to limitations on funding; and (2) because patients who are residents of those counties which forego Medi–Cal funding have no access to the service at all, unless they privately pay.[56] Plaintiffs argue that the reasonable promptness provision is violated not only by undue administrative delays, such as in processing requests for services, but also by delay caused by insufficient funding. The argument is persuasive and summary judgment is granted to plaintiffs on their reasonable promptness claim.[57]

When Congress passed the Medicaid Act in 1965, it included several provisions in the Act that were contained in almost identically phrased provisions in existing chapters of the Social Security Act, such as AFDC and Aid to the Blind. *See* S.Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 1943, 2014–15. One such provision was the reasonable promptness requirement.

In *Jefferson v. Hackney*, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), the Court noted that the reasonable promptness provision in the AFDC program, 42 U.S.C. § 602(a)(10)(A), was

> enacted at a time when persons whom the State had determined to be eligible for the payment of benefits were placed on waiting lists, because of the shortage of state funds. The statute was intended to prevent the States from denying benefits, even temporarily, to a person who has been found fully qualified for aid.

*Id.* at 545, 92 S.Ct. at 1731. The Court's understanding of the purpose of the reasonable promptness provision is confirmed by the relevant Conference Committee report, which noted that "[t]he requirement to furnish assistance 'with reasonable promptness' will still permit the States sufficient time to make adequate investigations but will not permit them to establish waiting lists for individuals eligible for assistance." Conf. Rep. No. 2271, 81st Cong., 2d Sess. (1950), *reprinted in* 1950 U.S.C.C.A.N. 3287, 3482, 3507; *see also* H.R.Rep. No. 1300, 81st Cong., 1st Sess. 48 (1949) (decision by states "not to take more applications or to keep eligible families on waiting lists until enough recipients could be removed from the assistance rolls to make a place for them … results in undue hardship on needy persons and is inappropriate in a program financed from federal funds"); 95 Cong.Rec. 13,934 (Oct. 5, 1949) (remarks of Rep. Forand) (noting that the proposed amendment to the Social Security Act would prohibit the "discriminatory practice" of not granting aid to applicants until persons already on the assistance rolls cease to receive assistance).

It follows from *Jefferson* that the Medicaid Act's reasonable promptness requirement, set forth at § 1396a(a)(8), prohibits states from responding to budgetary constraints in such a way as to cause otherwise eligible recipients to be placed on waiting lists for treatment. *See Morgan v. Cohen*, 665 F.Supp. 1164, 1177 (E.D.Pa.1987); *see also Linton v. Carney*, 779 F.Supp. 925 (M.D.Tenn.1990) (Tennessee's policy of limiting the number of beds in Medicaid participating nursing homes that could be used for Medicaid patients violated § 1396a(a)(8) by causing those patients "to experience extended delays and waiting lists in attempting to gain access to long term nursing home care"); *cf. Clark v. Kizer*, 758 F.Supp. 572, 580 (E.D.Cal.1990) (granting summary judgment to plaintiffs on reasonable promptness

---

**56.** As noted earlier, plaintiffs have established that some of the methadone maintenance providers receive insufficient funds to serve all the Medi–Cal eligible in need of treatment; in response, some providers have created waiting lists for the Medi–Cal funded slots. Nikkel Decl., ¶¶ 8, 9, 11; Slattery Decl., ¶ 10; Kueffner Dep., 100:13–101:6; Dep. of Reda Z. Sobky, 35:1–6, 37:23–38:1. For evidence that treatment is limited based on county of residence, see part III.A. *supra.*

**57.** In the previous Memorandum of Decision and Order, filed on October 26, 1993, the court rejected plaintiffs argument that delays in the furnishing of medical assistance caused by the placement of plaintiffs on waiting lists for methadone maintenance treatment slots violate § 1396a(a)(8). Plaintiffs have moved for reconsideration of this finding. Upon further review, the court concludes that its initial ruling was in error. Thus, plaintiffs' motion for reconsideration is granted.

claim because the undisputed declarations of county public health officials indicated that "class members frequently experience delays in obtaining appointments for regular and emergency dental care with those providers participating in Denti–Cal"), *aff'd in part and vacated in part on other grounds sub nom., Clark v. Coye,* 967 F.2d 585 (9th Cir. 1992) (table). *Compare King v. Sullivan,* 776 F.Supp. 645, 648, 651 (D.R.I.1991) (plaintiffs charged that Rhode Island did not spend enough money on intermediate care facilities for the mentally retarded ("ICF–MR"); where State had offered plaintiffs "medical assistance" through placement in a public ICF–MR center, plaintiffs not entitled to summary judgment notwithstanding their contention that they were entitled to private ICF–MR services).[58]

The undisputed evidence in this case demonstrates that the insufficient funding by the State and counties of methadone maintenance treatment slots has caused providers of methadone maintenance to place eligible individuals on waiting lists for treatment. This is precisely the sort of state procedure the reasonable promptness provision is designed to prevent.[59] Plaintiffs are entitled to summary judgment on this claim.

### IV. *Due Process Claim*

■ Plaintiffs allege that the State failed to provide them with "notice or meaningful hearing" before terminating their Medi–Cal funded methadone maintenance services. *Merritt* Compl., ¶ 90. Specifically, plaintiffs claim that the failure of the State to provide for notice from the State and for State hearings violates their right to due process. Pls.' Opp'n to Mot. to Dismiss at 14.

Defendants do not dispute that plaintiffs have a legitimate claim of entitlement to the continued receipt of Medicaid services and that due process must be provided. Rather, defendants seek summary judgment on the basis that the existing fair hearing procedures provide all the process that is constitutionally required.[60]

As evidence that the State has an established procedure which comports with due process, defendants offer the declaration of a Department official that each county which receives Drug/Medi–Cal funds must establish fair hearing procedures consistent with those included in the interagency agreement between the Department of Health Services and the Department of Alcohol and Drug Programs. Supplemental Decl. of Venus Little, ¶¶ 2, 3 & 4. The agreement states that "[e]ach Medi–Cal beneficiary has the right to a fair hearing related to denial, termination or reduction of [Drug/Medi–Cal] services" and establishes procedures under which that hearing is to be given. Defs.' Ex. 1, Attach. B at 7. Drug/Medi–Cal recipients are enti-

---

**58.** It also should be noted that the regulation which implements § 1396a(a)(8) is hostile to waiting periods. *See* 42 C.F.R. § 435.911(e) ("The agency must not use the time standards— (1) As a waiting period before determining eligibility. . . .").

**59.** Claiming that health care "is fundamentally different than welfare," Opposition to Mot. for Reconsideration at 4, defendants attempt to distinguish the meaning of reasonable promptness in the AFDC and Medicaid contexts. This argument is unpersuasive. A waiting list for medical treatment due to insufficient funding is just as arbitrary as a waiting list to receive welfare checks. Congress has given states substantial discretion in determining eligibility for various Medicaid-funded programs, and in setting the proper amount, scope, and duration of medical assistance to include in their Medicaid plans. As has been noted repeatedly throughout this opinion, the states have the discretion to decline to provide any coverage for methadone maintenance. Moreover, in defining the nature and extent of covered medical services, the states may consider budgetary constraints. Once the

services are selected and defined, however, the Medicaid Act does not permit the states to limit such assistance to some individuals because of insufficient funding. This interpretation of the reasonable promptness provision is also consistent with the comparability requirement.

**60.** Defendants' alternative argument that there is no state action is without merit. *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982), is not controlling. State action did not exist in *Blum* when a private entity made a medical decision to transfer Medicaid patients to a lower level of care; the change in benefits received from the State was merely the result of this private medical decision. *Id.* The situation here is markedly different. The decision to eliminate Medi–Cal funded methadone maintenance treatment slots was made by the counties, under authority delegated to them from the State, and the private providers merely executed this decision. Accordingly, defendants have not shown that no state action exists.

tled to a hearing under the procedures governing the rights of Medi–Cal beneficiaries in general (Title 22 of the Code of California Regulations) as well as under the procedures governing services administered by the Department of Alcohol and Drug Programs (Title 9). *Id.* at 8. Providers must inform beneficiaries in writing ten days prior to any termination or reduction of their benefits, and beneficiaries may request a hearing administered by the State Department of Social Services. *Id.* at 7.

Plaintiffs suggest that this fair hearing procedure is constitutionally deficient because it requires providers rather than the State, or the counties as agents of the State, to provide written notice to beneficiaries concerning benefit termination. But plaintiffs provide no authority for the position that the duty to provide notice may not be delegated by the State to providers. In *Frank v. Kizer*, 213 Cal.App.3d 919, 261 Cal.Rptr. 882 (1989), the court did not hold that due process prohibits the State from delegating the notice-giving function to Medi–Cal providers. In fact, the plaintiffs in *Frank* did not allege a violation of due process; instead, they claimed that the State's refusal to provide a 10–day notice of termination in all cases violated federal regulations not at issue here. *Id.* at 921, 924, 261 Cal.Rptr. at 884, 886. Because the State conceded in *Frank* that its notice policy violated federal regulations, the court never expressly ruled whether the delegation to providers was permissible. *See id.* at 922, 261 Cal.Rptr. at 885. As a result, plaintiffs' reliance on *Frank* is misplaced.

There is no other authority offered for the surprising proposition that the State may not delegate the giving of notice to private providers any more than it may not delegate the delivery of "State notice" to the United States Postal Service. What is important under the Constitution is that notice be given, not who generates or delivers the notice.[61]

Further, plaintiffs make no showing that the State's constitutionally adequate procedures have not been put into effect. Plaintiffs' sole evidentiary offering consists of a declaration by the attorney for a Medi–Cal recipient residing in Los Angeles County who was notified in August of 1992 that her Medi–Cal funded methadone maintenance "slot" was being eliminated.[62] Decl. of Barbara A. Jones, ¶ 2. This recipient "received no written notice of action advising her that her Medi–Cal was being limited or terminated" nor did she "receive any written notification that she had a right to a state hearing." *Id.*, ¶ 3.[63] Even if this one recipient received no constitutionally sufficient notice, failure to notify in a single instance does not indicate that the State has failed to put its fair hearing procedures into practice.

At oral argument, plaintiffs challenged the adequacy of the fair hearing procedure on the ground that it exists only in the counties' "utilization control plans" and that there is no relationship between utilization review and the decision to terminate plaintiffs' methadone maintenance treatment. Plaintiffs, however, offer only argument on this point,

**61.** Because plaintiffs fail to show that the State must issue the notice rather than the providers, the court does not reach plaintiffs' claim that the State fails to maintain records of Medi–Cal patients receiving methadone maintenance treatment and therefore has no mechanism in place to issue State notices.

**62.** Plaintiffs also cite to the deposition testimony of Ron Kletter in support of their claim that certain plaintiffs terminated from one methadone maintenance program did not receive state notices advising them that they had a right to a state hearing. Pls.' Opp'n to Mot. to Dismiss at 18. However, the pages of the deposition transcript cited by plaintiffs, with one exception, do not reflect that Kletter was ever asked whether notice was given to patients. The fact that he did not voluntarily mention notice in his answers to

questions addressed to other topics is insufficient to support plaintiffs' contention. On page 210 of the transcript, Kletter states only that he cannot recall whether terminated patients received any written correspondence from the provider. Kletter Dep., 210:10–14.

**63.** The Jones declaration states only that one patient received no *written* notice either of the termination action or that she had a right to a state hearing—not that she received no notice at all. There are no facts from which the court can evaluate whether the actual process this plaintiff received satisfies the standards of *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Thus, this declaration is insufficient to create a disputed issue that equitable relief should be awarded to plaintiffs on the due process claim.

not evidence.[64] Similarly, plaintiffs argue, without supporting evidence, that the State does not monitor providers' compliance with the hearing procedure.

Because plaintiffs have not shown either that the State's fair hearing procedure is unconstitutional on its face or that it is ignored in practice, the record cannot support a finding of a violation of due process. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The court grants summary judgment on this claim to defendants.

## V. *Conclusion*

It may well be that the State's system of distribution of methadone maintenance treatment through the counties is a reasonable one, which takes into account the needs of eligible patients, the wishes of the local community, and the State's budgetary constraints. The only question for the court, however, is whether this system violates the various provisions of the Medicaid Act which limit the discretion of participating states.

For the reasons stated above, defendants' motion for summary judgment on plaintiffs' due process claim is granted. Defendants' motion to dismiss plaintiffs' claims under 42 U.S.C. § 1396a(a) is denied, except as to the claim under § 1396a(a)(5), the "single state agency" provision. This claim is dismissed, and plaintiffs' motion for summary judgment on the claim is denied. Plaintiffs' motion for summary judgment also is denied as to the claims brought under 42 U.S.C. § 1396a(a)(30), the equal access provision, and 42 C.F.R. § 440.230(b), the regulation requiring service sufficient in amount, duration, and scope.

Plaintiffs have established a likelihood of success on the merits of their claim under 42 U.S.C. § 1396a(a)(1), the statewide provision.

Further, they have demonstrated that the balance of hardships tips in their favor. Accordingly, the motion for preliminary injunction is granted on the basis that the State Medicaid plan is not in effect statewide.[65] In addition, plaintiffs' motion for summary judgment is granted with respect to the claims brought under 42 U.S.C. §§ 1396a(a)(10)(B) & 1396a(a)(8), the comparability and reasonable promptness requirements.

In accordance with the discussion in parts III.C and III.F of this memorandum, the court contemplates a permanent injunction requiring the State to assure that all eligible categorically needy individuals receive methadone maintenance treatment services that are equal in amount, duration, and scope; that all eligible categorically needy persons receive methadone maintenance treatment services that are at least equal in amount, duration, and scope to services provided to medically needy persons; and that no persons eligible for Medi–Cal funded methadone maintenance treatment services will be placed on waiting lists for such services due to budgetary constraints. The court requests that the parties meet and confer as to the precise terms of the permanent injunction. Within 21 days of the date this order is filed, the parties shall submit a proposed order, if they can agree. Otherwise, the parties shall submit by that date separate orders with a brief in support of the proposed order. The court may then require an additional hearing.

IT IS SO ORDERED.

---

64. The allegations in the complaint—averring lack of due process afforded to 32 Medi–Cal recipients in Alameda County when their benefits were withdrawn—actually tend to disprove plaintiffs' point. Paragraph 33 alleges that the Alameda County provider did in fact inform plaintiffs of their termination from Medi–Cal and paragraph 34 states that plaintiffs requested and received a hearing before "an administrative law judge." This hearing was apparently conducted by the State of California. *See* Pls' Opp'n to Mot. to Dismiss at 16 n. 5. The provider continued to treat these plaintiffs pending the hearing decision. *Merritt* Compl., ¶ 34.

65. A preliminary injunction was entered with respect to plaintiffs' statewide claim on December 1, 1993.